No. 100,544

STATE OF KANSAS, *Appellee*, v. REGINALD M. JOHNSON, *Appellant*.

(236 P.3d 517)

Opinion filed August 6, 2010.

*Lydia Krebs*, of Kansas Appellate Defender Office, was on the brief for the appellant.

*Julie A. Koon*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

DAVIS, C.J.: Reginald M. Johnson was found guilty of first-degree murder. He was sentenced to life in prison without the possibility of parole for 25 years. Johnson appeals his conviction. We affirm.

FACTUAL AND PROCEDURAL OVERVIEW

Most of the facts presented are from the testimony of defendant Reginald M. Johnson.

Johnson was at work on August 20, 2007, when his colleague, Eddie Porter, approached him during their lunch break and told him that Johnson needed to talk to Amy Whiteman, Johnson's common-law wife. Johnson, suspicious that Whiteman might be cheating on him, asked Porter if Whiteman was "stepping out" on him. Porter confirmed Johnson's suspicions, told him he needed to speak with her, and provided Johnson with a name: Anthony.

Johnson received permission from his boss to leave work for the rest of the day, called Whiteman, and asked that she meet with him in a nearby parking lot. Johnson confronted Whiteman, and she told him that Anthony was "just a friend." Johnson, however, did not believe Whiteman and demanded that she give him back his truck and move out of their house. Whiteman suggested they go home and talk, but instead they went to see her (and also formerly his) therapist.

They arrived at the therapist's office only to discover she was unavailable and again began discussing their situation in the office parking lot. Johnson again asked Whiteman about Anthony, and she continued to deny that Anthony was anything more than a friend. Johnson told her to give him her car keys and cell phone because both belonged to him. He then told her that he would have her belongings waiting for her in the front yard, "so there [was] no reason for [her] to come in the house." Johnson then locked the vehicle he had been driving and left in the truck Whiteman had been driving. Johnson, who suffered from depression and had previously attempted suicide, called his therapist and made an appointment to see him that evening. He then drove home. Whiteman called her friend Lisa Sandoval to pick her up and take her home to get her clothes.

Johnson arrived home and started moving Whiteman's clothes into the front yard. As he was doing so he noticed a rose and a card he had given to Whiteman the day before. "At that point," Johnson testified, he "didn't want to live any more." He then re-

trieved his gun, planning on committing suicide. Noticing Sandoval's car arrive in front of the house, however, he instead put the gun in the closet by the front door and went out to the front yard. Johnson there again confronted Whiteman about her infidelity and their relationship, while Sandoval waited in her car.

Sandoval reminded Whiteman and Johnson twice that their son, Josiah, would be home from school soon and suggested they remove Whiteman's belongings from the yard. Johnson and Whiteman finally started carrying them back into the house. Sandoval checked with Whiteman to make sure she was okay before Sandoval left, and Whiteman indicated she was fine. Johnson thanked Sandoval for bringing Whiteman home, said everything was going to be all right, and told her that he was not the "monster" Whiteman had portrayed him to be. Sandoval asked Whiteman to call her later and left.

Whiteman and Johnson continued moving Whiteman's belongings back inside. They also agreed that Whiteman would accompany Johnson to meet with his therapist that evening to discuss their situation and possible separation. They moved to the backyard and continued to talk about their problems. While there, Josiah arrived home from school. Johnson told Whiteman she needed to tell Josiah why they were separating. He told Josiah that his mother was sleeping with another man. Josiah indicated he did not want to move away and left to ride his bike around the neighborhood.

After Josiah left, the couple went back inside and continued talking. Eventually Johnson told Whiteman to pack up her things. Whiteman, however, saying she needed "closure" so she could "move on," told him she had been planning on moving out and had been having an affair with Anthony. Johnson told her he did not want to hear about it, but she continued, telling him she had slept with the man four times. Johnson told her he did not want to know any more and said, "Could you just get your things now and leave?" Whiteman refused to leave and instead continued to provide details on the affair. Then, according to Johnson, his "heart started beating really fast, just pounding," his head started to hurt, and then everything went black. He did not remember getting the gun from the closet, did not remember hearing the shotgun "being

discharged," never intended to hurt Whiteman, but simply wanted her to "get her things and leave." At some point, a noise at the door roused him, and he opened his eyes. Whiteman was lying on the floor. Fearing the noise at the door was Josiah coming home, he pulled Whiteman's body into the bedroom because he "didn't want [Josiah] to see his mom like that."

The State described those same events this way: Johnson silenced Whiteman "when he retrieved his Mossberg pump-action shotgun from the living room closet, pointed it at her, and shot her four times."

Johnson then went to a Wichita police station and informed officers there that he had hurt his wife. The police went to Johnson's house, found three shotgun shells and the shotgun on the floor of the living room, a trail of blood leading to a bedroom, and Whiteman's bloody body on the bedroom floor. The body was transported to the hospital, where Whiteman was pronounced dead from shotgun wounds to the chest and thigh.

Johnson was charged with first-degree, premeditated murder. He proceeded to a jury trial where the court instructed the jury as to first-degree murder, second-degree murder, and "heat of passion" voluntary manslaughter. During the instructions conference, defense counsel requested an instruction on "sudden quarrel" voluntary manslaughter. The district court denied the request and instead instructed the jury only on heat of passion voluntary manslaughter. The jury convicted Johnson of one count of first-degree murder. The district court sentenced him to life in prison with the possibility of parole after 25 years.

Johnson appealed his conviction, arguing the district court erred in failing to instruct the jury on sudden quarrel voluntary manslaughter. This court's jurisdiction is under K.S.A. 22-3601(b)(1) (off-grid crime; life sentence).

## DISCUSSION

The district court instructed the jury as to first-degree murder, second-degree murder, and heat of passion voluntary manslaughter. During the instructions conference, defense counsel had also requested an instruction on sudden quarrel voluntary manslaugh-

ter, but the district court denied the request and instead instructed the jury only on heat of passion voluntary manslaughter. The court found that the conflict between Johnson and Whiteman had been "building all day long." Even though the court did instruct on heat of passion voluntary manslaughter, Johnson argues that "[b]ecause the two forms of manslaughter [sudden quarrel and heat of passion] are not separate, and because there was sufficient evidence of a 'sudden quarrel' to require an instruction on that theory, this court must reverse" his conviction.

The State argues alternatively that the district court's refusal to give the requested sudden quarrel voluntary manslaughter instruction was not error because, as the judge noted during the instructions conference, he did not "see any evidence whatsoever of a sudden quarrel." We agree. The evidence presented did not support a sudden quarrel instruction.

### Standard of Review

This court has held:

" 'The district court "must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence." *State v. Williams*, 277 Kan. 338, 356, 85 P.3d 697 (2004). "A defendant is entitled to an instruction on his or her theory of the case even though the evidence thereon is slight and supported only by the defendant's own testimony. [Citation omitted.]" *State v. Bell*, 276 Kan. 785, 792, 80 P.3d 367 (2003). Further, as mentioned, this court reviews the evidence in the light most favorable to the party requesting the instruction when considering the district court's refusal to give a requested instruction. *Williams*, 277 Kan. at 356.' " *State v. Anderson*, 287 Kan. 325, 331, 197 P.3d 409 (2008) (quoting *State v. Oliver*, 280 Kan. 681, 706, 124 P.3d 493 [2005], *cert. denied* 547 U.S. 1183 [2006]).

In *State v. White*, 284 Kan. 333, 347, 161 P.3d 208 (2007), this court also held:

" ' "A trial court must instruct the jury on a lesser included offense 'where there is some evidence which would reasonably justify a conviction' of the lesser offense. [Citation omitted.] 'If the defendant requests the instructions, the trial court has a duty to instruct the jury regarding all lesser included crimes that are *established by the evidence*, regardless of whether the evidence is weak or inconclusive.' [Citation omitted.] 'However, the duty to so instruct arises *only where there is evidence supporting the lesser crime*.' [Citation omitted.] An instruction on a lesser included offense is not required if the jury could not reasonably convict the de-

fendant of the lesser included offense *based on the evidence presented.* [Citation omitted.]" ' (Emphasis added.) *State v. Boyd,* 281 Kan. 70, 93, 127 P.3d 998 (2006) (quoting *State v. Drennan,* 278 Kan. 704, 712-13, 101 P.3d 1218 [2004])."

In addition:

"[A]n appellate court cannot consider the requested instruction in isolation. Rather, the court must consider all of the instructions together as a whole. If the instructions as a whole properly and fairly state the law as applied to the facts of the case, and the jury could not reasonably be misled by them, the instructions are not reversible error even if they are in some way erroneous. [Citation omitted.]" *State v. Jackson,* 280 Kan. 541, 550, 124 P.3d 460 (2005).

*The Instructions*

During the jury instruction conference, there was extensive discussion on sudden quarrel voluntary manslaughter and whether the evidence supported Johnson's recommended sudden quarrel or heat of passion instruction. The district court found the evidence did not support such an instruction. As a result, it instructed the jury on first-degree murder, on second-degree murder as a lesser included offense of first-degree murder, and on heat of passion voluntary manslaughter as a lesser included offense of second-degree murder. The district court's actual relevant instructions to the jury were:

"INSTRUCTION NO. 4
"Reginald Johnson is charged with the crime of murder in the first degree. Mr. Johnson pleads not guilty.
"To establish this charge, each of the following claims must be proved:
    1. That Reginald Johnson intentionally killed Amy Whiteman;
    2. That such killing was done with premeditation; and
    3. That this act occurred on or about August 20, 2007, in Sedgwick County, Kansas."

"INSTRUCTION NO. 6
"If you do not agree that Reginald Johnson is guilty of murder in the first degree, you should then consider the lesser included offense of murder in the second degree.
"To establish this charge, each of the following claims must be proved:
    1. That Reginald Johnson intentionally killed Amy Whiteman; and
    2. That this act occurred on or about August 20, 2007, in Sedgwick County, Kansas."

"INSTRUCTION NO. 7

"In determining whether Reginald Johnson is guilty of murder in the second degree, you should also consider the lesser offense of voluntary manslaughter. Voluntary manslaughter is an intentional killing done in the heat of passion.

"If you decide Reginald Johnson intentionally killed Amy Whiteman, but that it was *done in the heat of passion,* the defendant may be convicted of voluntary manslaughter only.

"To establish this charge, each of the following claims must be proved:

    1. That Reginald Johnson intentionally killed Amy Whiteman;

    2. That it was *done in the heat of passion;* and

    3. That this act occurred on or about August 20, 2007, in Sedgwick County, Kansas." (Emphasis added.)

The only meaningful difference in the instructions proposed by Johnson might have resulted in a change to this actual INSTRUCTION NO. 7, where the words *"done in the heat of passion"* might, based on Johnson's proposed wording, have instead been *"done upon a sudden quarrel or heat of passion."*

Johnson made no proposal as to a definition of "sudden quarrel," which might then have been incorporated into the next actual instruction given:

"INSTRUCTION NO. 8

"As used in Instructions Numbered 4 and 7, the following definitions apply:

    'Premeditation' means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life.

    'Heat of Passion' means any intense or vehement emotional excitement which was spontaneously provoked from circumstances. Such emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection." (Emphasis added.)

Johnson was convicted of first-degree murder.

*Was There Error in the Instructions Given?*

The evidence presented in the instant case is that Johnson and the victim had been discussing their situation and relationship all day. Based on review of the briefs and the record, there does not appear to be any evidence regarding a sudden argument or quarrel immediately preceding the victim's death. Johnson stated:

"When Whiteman refused to leave and instead continued to provide details about the affair, Mr. Johnson's 'heart started beating really fast, just pounding.' His head started to hurt, and then everything went black. At some point, a noise at the door roused him, and he opened his eyes. Whiteman was lying on the floor. Fearing that the noise at the door was Josiah coming home, Mr. Johnson pulled Whiteman's body into the bedroom because he 'didn't want [Josiah] to see his mom like that.' "

Johnson did not testify to any sudden quarrel. In fact, it appears that Johnson blacked out during the actual events of the victim's death.

In *State v. Graham*, 275 Kan. 831, 69 P.3d 563 (2003), the court referenced what it saw as support for a sudden quarrel instruction in *State v Cribbs*, 29 Kan. App. 2d 919, 34 P.3d 76 (2001). "Immediately [preceeding] the shooting, an argument erupted between the parties giving rise to an emotionally-charged domestic situation." 275 Kan. at 839.

In his brief to this court, Johnson relied heavily on *Graham*; however, the facts in that case are distinguishable from the facts in the instant case. In *Graham*, it appears that Graham's wife let it be known throughout the day in question that she was angry with Graham. Later that day, Graham ordered her into his truck, but she refused. Graham threatened her, and the victim, Crow, intervened. Graham and Crow then had an angry exchange and Graham drove off. Sometime later, Graham returned and approached Crow, cursing and saying he was going to kill him. They got into a physical altercation, resulting in Crow being stabbed. The actual quarrel that immediately led to the murder in *Graham* did occur quite suddenly, and the stabbing occurred during the physical altercation that immediately followed the sudden quarrel. The *Graham* court noted that "in both *Cribbs* and this case there was *some evidence* of 'heat of passion' or 'sudden quarrel.' Thus, in each case the defendant was entitled to have the jury consider such evidence during its consideration of the elements of attempted second-degree murder." (Emphasis added.) 275 Kan. at 839.

This was not, however, the situation with Johnson and his wife in the instant case. As the district court noted:

"I don't see how you can call it sudden quarrel when it's been building all day. Sudden quarrel. Common words have their common meaning. And this has been something that has been building all day long.

"He's already thrown her clothes out into the yard. He's already told her son that she was leaving because she was cheating. I don't see any evidence whatsoever of a sudden quarrel.

. . . .

"This is a fight that was going on all day long, was going on all day. He throws her clothes out into the yard. It's not a sudden quarrel because he just suddenly decides to shoot her, whether he's aware of it or not."

The court in *State v. Coop*, 223 Kan. 302, 573 P.2d 1017 (1978), conducted the most thorough analysis of sudden quarrel under Kansas case law. The court stated:

" 'Sudden quarrel' per se did not arise from the common law definition. Manslaughter required only 'heat of passion' or 'hot blood,' etc. [Citations omitted.] The Kansas wording apparently comes from the federal statute:
  'Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
  'Voluntary—Upon a sudden quarrel or heat of passion.'
  . . . . (18 U.S.C. § 1112[a]).
"For the moment, if we use words such as 'sudden combat' and 'sudden affray' to have similar meanings as 'sudden quarrel,' we see that for the most part it is not truly a separate creature. It is merely one of the means of provocation which brings on heat of passion. [Citations omitted.] '. . . [A] sudden combat is ordinarily considered on the same footing as other provocations operating to create such passion as temporarily to unseat the judgment.' [Citation omitted.]
"A few jurisdictions have made affray or quarrel a part of the statutory language. *E.g.*, 18 U.S.C. § 1112(a); Calif. Penal Code § 192; K.S.A. 21-3403.
"In spite of the 'or' wording in the statutes mentioned and in the case law of other jurisdictions, only one jurisdiction has treated the terms separately. . . .
. . . .
" 'Quarrel,' standing alone, has been defined in a general sense:
  'In an untechnical sense, it signifies an altercation, or angry dispute, an exchange of recriminations, taunts, threats or accusations between two persons. [Citations omitted.]' Black's Law Dictionary 1409 (Revised 4th ed. 1968).
"No Kansas case defines the term 'sudden quarrel.' The few cases to even mention it do so in conjunction with 'heat of passion' in quoting the general definition of manslaughter, and then go on to discuss only 'heat of passion.' *State v. Stafford*, 213 Kan. 152, 515 P.2d 769; *State v. Burrow & Dohlmar*, 221 Kan. 745, 561 P.2d 864; *State v. Pyle*, 216 Kan. 423, 532 P.2d 1309.
"The same situation exists in the California and federal cases. The cases, if they mention sudden quarrel at all, just discuss heat of passion or else mix the terms

together, such as 'upon a sudden quarrel in heat of passion.' *People v. Dugger*, 179 Cal. App. 2d 714, 4 Cal. Rptr. 388 (1960); see *People v. Sedeno*, 10 Cal. 3d 703, 518 P.2d 913, 112 Cal. Rptr. 1 (1974); *People v. Best*, 13 Cal. App. 2d 606, 57 P.2d 168 (1936).

"*Sudden quarrel is one form of provocation for 'heat of passion' and is not separate and apart from 'heat of passion.' The provocation whether it be 'sudden quarrel' or some other form of provocation must be sufficient to cause an ordinary man to lose control of his actions and his reason.*

"In this case there was no evidence of sufficient provocation for defendant's acts to entitle him to an instruction on voluntary manslaughter. His own testimony on direct examination on the issue was:

'I remember my wife was sitting in the chair in the front room and we started talking about something. This was pretty faint. I don't really remember well, but I do remember we started talking about something and disagreeing on something, but I don't remember what it was we was even disagreeing on. We wasn't a heated argument, not really what you call actually—maybe not even an argument really. It was just a disagreement on some little thing we was discussing.'

"We hold that the evidence at trial did not support an instruction on voluntary manslaughter as a lesser included offense. The trial court properly refused to give the requested instruction." (Emphasis added.) 223 Kan. at 305-07.

The facts in *Coop* are similar to the facts in the instant case. Like the defendant in *Coop*, Johnson testified that the encounter between him and Whiteman was not heated and they were not yelling or screaming at each other. In *Coop*, this court found "no evidence of sufficient provocation" such that the defendant was entitled to a separate instruction on voluntary manslaughter, let alone sudden quarrel. 223 Kan. at 307. In the instant case, there is similarly no evidence of sudden quarrel.

Further, the court in *Coop* held that sudden quarrel is one form of heat of passion and not separate and apart therefrom. The court described "heat of passion" as including an " 'emotional state of mind characterized by anger, rage, hatred, furious resentment, or terror. It must be of such a degree as would cause an ordinary man to act on impulse without reflection.' " *Coop*, 223 Kan. at 305 (quoting *State v. Ritchey*, 223 Kan. 99, Syl. ¶ 1, 573 P.2d 973 [1977]).

"Heat of passion" is defined as:

"Rage, terror, or furious hatred suddenly aroused by some immediate provocation, usually another person's words or actions. At common law, the heat of

passion could serve as a mitigating circumstance that would reduce a murder charge to manslaughter. Also termed sudden heat of passion; sudden heat; sudden passion; hot blood; sudden heat and passion; furor brevis." Black's Law Dictionary 791 (9th ed.).

"Sudden" is commonly defined as: "1. Happening without warning; unforeseen. 2. Characterized by hastiness; abrupt; rash. 3. Characterized by rapidity; quick; swift." The American Heritage Dictionary of the English Language 1286 (1969).

"Quarrel" is defined as: "An altercation or angry dispute; an exchange of recriminations, taunts, threats, or accusations between two persons." Black's Law Dictionary 1363 (9th ed.); "An angry dispute; an altercation." The American Heritage Dictionary of the English Language 1069 (1969).

In the instant case, Instruction No. 8 defined "heat of passion" as "any intense or vehement emotional excitement which was spontaneously provoked from circumstances. Such emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection."

Based on this instruction, an unforeseen angry altercation, dispute, taunt, or accusation could fall within this definition as sufficient provocation. While the trial judge did not utilize the term "sudden quarrel" in his instructions, we note that Kansas, along with most states, considers sudden quarrel to be one form of heat of passion. Accordingly, Instruction No. 8 was sufficiently broad to include sudden quarrel as one form of heat of passion.

Additionally, there was no evidence of sudden quarrel. During the jury instruction conference, the trial judge succinctly described the lack of any evidence supporting a sudden quarrel between Johnson and his wife.

"[Johnson] said that he became angry. . . . But . . . he professed he remained calm, telling her that she just needed to leave.

. . . .

"I'm telling you what I see in the evidence. Which is, he says that he remained calm, that they weren't fighting, that he just wanted her to leave. He told her to stop, wanted her to leave. He says over and over again that he was calm.

". . . But there was nothing about a quarrel, or some blow up, or anything like that. . . . And the only evidence that comes out about what was going on imme-

diately, prior to her being shot, is that comes from [Johnson], who claims he was calm. Period. . . .

. . . .
"I don't see how you can call it sudden quarrel . . . .
". . . I don't see any evidence whatsoever of a sudden quarrel."

There was no error in the jury instructions by the district court. Affirmed.