NOT DESIGNATED FOR PUBLICATION

No. 108,453

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

APPRENTICE J. DESHAZER,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; GREGORY L. WALLER, judge. Opinion filed September 4, 2015. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., LEBEN, J., and HEBERT, S.J.

*Per Curiam*: Apprentice J. Deshazer appeals from his conviction by a jury of three counts of attempted first-degree murder, one count of attempted second-degree murder, and several other person felonies. He argues that the district court erred by denying his request to instruct the jury regarding the lesser-included offense of attempted voluntary manslaughter. He also alleges that the district court improperly admitted hearsay evidence.

We find no error and affirm the convictions.

*Factual and Procedural Background*

On July 14, 2011, Timothy McCoy went to Club Rodeo with his wife, Sara Fischer, his brother, Kevin Walker, and their cousin, Jeffrey Daniels. They arrived around 11:00 p.m. in McCoy's 1997 white Crown Victoria. Local law enforcement considered Daniels to be a member of the Bloods street gang and Walker as a person associated with the Bloods.

The group stayed at the club until about 1:30 a.m. on July 15, 2011, when the club's lights were turned on in order to signal people to leave. All four individuals later testified that they were not involved in any altercations inside the club. On their way back to the car, they noticed a few fights occurring in the back of the parking lot but they had no trouble reaching the car. McCoy drove, Fischer sat in the front passenger seat, Daniels sat in the rear driver-side seat, and Walker sat in the rear passenger-side seat. McCoy attempted to maneuver out of the parking lot but quickly had to stop because a group of about 15 to 20 people had gathered around the vehicle.

McCoy flashed his headlights at people standing in front of the car attempting to signal that he was trying to exit the lot. A young man wearing a dark blue shirt turned around and punched the hood of the vehicle. Blue is the primary color of the Crips street gang. Several people in the group began beating on the car's windows. McCoy got out of the car and began arguing with the man who had punched his car. Fischer began arguing with a group of women who had been banging their hands on the car's windows. She later testified that she noticed a woman with something metal in her hand approach McCoy, so she threw the car's plastic ashtray at the woman, but it did not hit anyone. No physical altercation ensued and Officer Jamie Schepis, an off-duty police officer providing security in the club's parking lot, approached to break up the argument. The group of people blocking their way departed, and Officer Shepis directed McCoy on how to exit while avoiding the crowds.

2

McCoy got back in the car but returned to the same line of vehicles in which he was previously driving. As the vehicle neared the exit, it came to a stop in traffic. Shortly after stopping, several shots were fired into the vehicle, one of which struck Walker in the back of his head. Daniels was struck in his right thigh and left thumb. McCoy attempted to drive away but the engine died and he was unable to restart it. Moments before the shooting, both Daniels and Walker remembered seeing a young male walk within a few feet of the vehicle on the driver's side and begin firing shots. Daniels believed that there were multiple people firing shots.

Following the shooting, police officers immediately blocked the parking lot exits. Wesley Jensen, a police officer for the City of Wichita, was one of the several officers who arrived to block the exits. About 5 minutes after the shots were fired, a police helicopter notified Jensen that a silver Impala left a line of traffic exiting the lot and was apparently looking for an exit. The helicopter illuminated the vehicle with its spotlight, and as it approached the exit, Officer Jensen yelled and flashed a light to signal the driver to stop. The vehicle tried to maneuver around Officer Jensen, but he stepped in front of the vehicle and hit the hood demanding that the driver stop. After the vehicle stopped, Officer Jensen drew his weapon and opened the driver's door. He saw three individuals in the vehicle and noticed that there was blood on the driver, who was later identified as Ronald Beard. Deshazer was sitting in the front passenger seat, and Jordan James was sitting in the rear driver-side seat. Officers found a 9 millimeter pistol resting on the front passenger seat where Deshazer was sitting. Officers also found a .45 caliber automatic pistol underneath the driver's seat. Both guns' magazines were empty and the .45 pistol had blood on it.

At the scene of the shooting, officers found four 9 millimeter casings, ten .45 caliber casings, and six .40 caliber casings. They also located another 9 millimeter pistol in the parking lot. The police never located the firearm that fired the six .40 caliber bullets. In total, there were 13 bullet holes in the Crown Victoria and 1 bullet strike where

3

a bullet did not penetrate the vehicle's exterior. There was also one bullet lodged in the vehicle's engine.

A firearm and tool mark examiner tested the weapons found in the silver Impala and determined that the gun found under Beard's seat fired all 10 of the .45 caliber casings that were recovered. The examiner also determined that two of the 9 millimeter casings were fired by the pistol found on the vehicle's passenger seat, while the other two 9 millimeter casings were fired by the gun found in the parking lot.

A DNA analyst tested the blood found on the .45 caliber automatic pistol and determined that it belonged to Beard. DNA testing also linked skin cells on the 9 millimeter pistol found in the silver Impala to Deshazer. However, the DNA analyst was unable to link DNA found on the gun in the parking lot to Deshazer, Beard, or three other individuals of interest.

On July 22, 2011, the State charged Deshazer with four counts of attempted first-degree murder and one count each of aggravated battery against Walker, aggravated battery against Daniels, aggravated assault against Fischer, criminal discharge of a firearm, and criminal possession of a firearm by a convicted felon. The Sedgwick County District Court conducted a 6-day jury trial beginning on March 26, 2012.

The State's theory at trial was that the shooting was an attempt to avenge the death of Mario Brown, a popular member of the Crips who was apparently murdered about 2 months before the shooting at Club Rodeo. Wichita police suspected that members of the Bloods were responsible for Brown's death and believed that Beard was a close friend of Brown.

The State called several witnesses who testified about gang activity they observed before the shooting. Officer Schepis testified he saw several Crips gang members leaving

4

the club who appeared to be upset. He also testified that he witnessed many of them flashing Crips gang signs. Officer Schepis later identified Deshazer as a man who was escorted out by another man shortly before the club closed. Officer Schepis noticed that Deshazer was missing his shirt and it appeared to him that Deshazer had been in a fight inside the club. Officer Schepis recognized the other man as Terry Bennett and observed that Bennett had to restrain Deshazer from going back into the club. Officer Schepis also recognized Beard as one of the individuals arguing with McCoy when he initially stopped his vehicle on the way out of the lot.

Jason Jones, who was working as a bouncer at Club Rodeo, testified that a few arguments took place throughout the evening and a fight broke out near closing time, which was common. However, Jones was unable to identify the persons involved in the fight. He believed there were about 700 to 800 people in the club that evening. He testified that the club began to shut down shortly after the people involved in the fight were escorted outside.

Damereo Baldwin, who was at the club that evening, witnessed a fight on the dance floor and stated that the parties were using language associated with the Crips. He also testified that they were gesturing with their hands to make gang signs representing the Crips. Alexus Means, who was at the club with two friends, stated she witnessed someone flashing signs for the Bloods.

The State also called Ronnie Phillips who testified he was housed in the same jail pod with Deshazer for a month following the shooting. Phillips testified that Deshazer told him he and Beard had been involved in a fight inside the club and then left the club to go to their car and get their guns. Phillips stated that Deshazer told him that he had a 9 millimeter pistol, Beard had a .45 caliber pistol, and the two waited for a certain car to arrive before they began firing. Phillips further testified that Deshazer told him that the shooting was intended to avenge the death of Mario Brown, a fellow member of the Crips

with himself and Beard. Deshazer also told him that he twisted his ankle while running back to the car where he sat on his gun.

Before the jury retired, Deshazer's trial counsel requested the district court give an instruction for attempted voluntary manslaughter. The State argued that Deshazer did not act in the heat of passion but instead executed a "calculated ambush" after he had significant time to cool off after leaving the club. Deshazer argued that there was enough evidence to warrant an attempted voluntary manslaughter instruction in light of Fischer's action in throwing an object out of the vehicle and Beard's injury to his hand. The district court agreed with the State and denied the request for the instruction.

After a 6-day trial, the jury found Deshazer guilty of all counts except for the count of attempted first-degree murder of Fischer; the jury instead returned a guilty verdict for attempted second-degree murder of Fischer. On May 10, 2012, the district court sentenced Deshazer to serve 620 months' imprisonment for the first count of attempted first-degree murder with the remaining counts running concurrent. Deshazer filed a notice of appeal on May 15, 2012. Following an order to show cause why Deshazer's appeal had not been prematurely filed, this court dismissed the appeal on September 17, 2012, because the district court had not established the amount of restitution.

On June 5, 2014, our Supreme Court entered orders vacating and remanding this court's order dismissing the appeal in light of *State v. Frierson*, 298 Kan. 1005, 319 P.3d 515 (2014); *State v. Charles*, 298 Kan. 993, 318 P.3d 997 (2014); and *State v. Hall*, 298 Kan. 978, 319 P.3d 506 (2014). This court retained Deshazer's appeal on July 14, 2014, noting that the district court entered a restitution order in July 2012.

*The District Court Correctly Denied the Request for an Attempted Voluntary Manslaughter Instruction.*

*Standard of Review*

An appellate court reviews jury instruction issues with the corresponding standards of review as follows: (1) First, it considers the issue's reviewability in regards to both jurisdiction and preservation, using a de novo standard of review; (2) second, it exercises unlimited review while determining whether the instruction was legally appropriate; (3) third, the court considers whether there was sufficient evidence to support the instruction while viewing the evidence in a light most favorable to the defendant or requesting party; and (4) finally, if the district court erred, the court must analyze whether such error was harmless, using the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). *State v. Smyser*, 297 Kan. 199, 203-04, 299 P.3d 309 (2013) (citing *State v. Plummer*, 295 Kan. 156, Syl.¶ 1, 283 P.3d 202 [2012]).

*The Requested Instruction*

Applying the *Plummer* analysis, we first note that Deshazer has preserved this issue for appeal by making a timely request for the attempted voluntary manslaughter instruction on the record during the instruction conference.

The voluntary manslaughter instruction is also legally appropriate. Courts in this State "'have held on numerous occasions that voluntary manslaughter is a lesser included offense of both first- and second-degree murder as a "lesser degree" of those crimes under K.S.A. 21-3107(2)(a).'" *State v. Wade*, 295 Kan. 916, 924, 287 P.3d 237 (2012) (quoting *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 [2008]).

7

The next question is whether the instruction was factually appropriate. In general, the district court must instruct the jury on the law applicable to the defendant's theory of defense if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. *State v. Hilt*, 299 Kan. 176, 184, 322 P.3d 367 (2014). If the defendant requested an instruction at trial, as Deshazer did here, this court must view the evidence in the light most favorable to the defendant. *State v. Williams*, 299 Kan. 1039, 1046, 329 P.3d 420 (2014). Regardless, there must be actual evidence in the record from which reasonable inferences can be drawn that support a conviction for the lesser included crime; courts "will not speculate about hypothetical scenarios." *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

In relevant part, voluntary manslaughter is "knowingly killing a human being committed . . . upon a sudden quarrel or in the heat of passion." K.S.A. 2011 Supp. 21-5404(a)(1). Attempt "is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof." K.S.A. 2011 Supp. 21-5301(a). Kansas, along with the majority of states, considers sudden quarrel as one form of heat of passion. *State v. Johnson*, 290 Kan. 1038, 1048, 236 P.3d 517 (2010).

"Heat of passion" is defined as "'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror,' based 'on impulse without reflection.'" *State v. Hayes*, 299 Kan. 861, 864, 327 P.3d 414 (2014) (quoting *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 [1985]). Indeed, "[t]he hallmark of heat of passion is taking action upon impulse without reflection." *Wade*, 295 Kan. at 925.

Courts use an objective test to review whether the provocation is legally sufficient. The defendant must be provoked to the degree that an ordinary person would lose control of his or her actions and reason. *Hayes*, 299 Kan. at 864-65. This standard necessarily

8

excludes the defendant's innate peculiarities. *State v. Molina*, 299 Kan. 651, 662, 325 P.3d 1142 (2014).

Deshazer suggests that several scenarios support his argument that he was acting under the heat of passion: (1) The fight in the club in which the State alleged he was involved; (2) the confrontation between the victims and the crowd of people as they were trying to leave the parking lot; and (3) the overall tense atmosphere surrounding the events leading up to the shooting.

Regarding the first possible scenario, Deshazer has not identified any evidence in the record that reveals the identity of the person or persons he fought with in the club. Therefore, it is impossible for this court to know if Deshazer was reacting to a prior or ongoing altercation with one of the victims when he fired the shots. See *State v. Bridges*, 297 Kan. 989, 1001, 306 P.3d 244 (2013) (party claiming error has the burden to designate a record that affirmatively shows prejudicial error).

Deshazer also focuses on the confrontation in the parking lot, and more specifically, on Fischer's action in throwing the plastic ashtray, which he characterized as "assaulting the crowd." But again, the record does not disclose whether Deshazer was even one of the individuals in "the crowd" who confronted the victims and blocked their automobile, nor is it clearly established why the victims were even confronted. Officer Schepis testified he saw Fischer arguing with a group of women who were beating on the car's windows, and Fischer stated that she threw the ashtray at a woman she thought was holding something metal. Although there was evidence someone punched the hood of the Crown Victoria, there is no evidence identifying that individual.

In any event, the mere evidence of a confrontation or altercation is not enough to support a finding of sufficient provocation. *State v. Mitchell*, 269 Kan. 349, 353, 7 P.3d 1135 (2000). "If assault or battery is involved, the defendant must have a reasonable

9

belief that he or she is in danger of great bodily harm or at risk of death." *State v. Gooding*, 50 Kan. App. 2d 964, 972, 335 P.3d 698 (2014), *rev. denied* 301 Kan. ___ (2015). We can safely assume that a reasonable person would not fear that great bodily harm or death would result from someone throwing a plastic ashtray. Such action would not reasonably warrant deadly retaliation by random gunfire.

Moreover, any imagined provocation engendered by the fight in the club and/or the confrontation in the parking lot was dissipated by the time intervals separating these events from the actual shootings. Deshazer left the club after the alleged fight and was dissuaded by Bennett from returning to the scene of that incident. Leaving the club in order to retrieve guns from a different location was not an impulsive reaction taken without reflection; it was a conscious and calculated action. The general confrontation in the parking lot was resolved without any physical altercation and the parties were directed to proceed on their way. The evidence reveals that Deshazer left the area and then returned prior to randomly firing his gun into a car occupied by four individuals. "An act of violence separated from the provocation by sufficient cooling time is the product of malice and cold calculation rather than heat of passion." *State v. Henson*, 287 Kan. 574, Syl. ¶ 3, 197 P.3d 456 (2008).

We conclude Deshazer's arguments fail to demonstrate actual evidence in the record from which a rational factfinder could draw reasonable inferences supporting a claim of attempted voluntary manslaughter without engaging in pure speculation. See *Woods*, 301 Kan. at 876. The proposed instruction is not factually appropriate, and the district court correctly denied Deshazer's request.

10

*The District Court Did Not Admit Hearsay Evidence.*

*Standards of Review*

Several inquires are involved when the admission or exclusion of evidence is at issue on appeal. First, appellate courts determine whether the evidence is relevant. See K.S.A. 60-401(b); *State v. Ultreras*, 296 Kan. 828, 857, 295 P.3d 1020 (2013). Once relevance is established, the appropriate standard of review depends on which rule the district court applied to determine the admissibility of the evidence at issue. *State v. Riojas*, 288 Kan. 379, 383, 204 P.3d 578 (2009).

In general, appellate courts review the admission of hearsay evidence using an abuse of discretion standard. *State v. Robinson,* 293 Kan. 1002, 1023, 270 P.3d 1183 (2012). Abuse of discretion means that the district court's decision was (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014).Yet when resolution of the issue requires the application of a specific statutory hearsay exception, appellate courts exercise unlimited review without deference to the district court's ruling. *Robinson*, 293 Kan. at 1023.

*The Evidence*

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence." K.S.A. 2011 Supp. 60-460.

During the State's case, Daniels testified that he was previously a member of the Bloods. Shortly thereafter, the following exchange took place between Daniels and the prosecutor:

"Q. On the night that you got shot, prior to that evening did you know that Mario Brown had been shot and killed?

"A. Yes, sir.

"Q. And how did you know that?

"A. My cousin—well, really, the news, but my cousin had told me.

"Q. Okay. And who's your cousin?

"A. June.

"Q. June had told you that Mario was shot?

"A. Well, no, the news told me that Mario was shot.

"Q. But you had talked about it with June?

"A. Yeah.

"Q. Did June give you any warnings on the night in question, of July 15th, of 2011, that caused you some concerns?

"A. Yes, sir.

"MR. WAGLE:  I'm sorry, Your Honor, that's going to call for a hearsay answer.

"THE COURT:  I'll sustain, unless this person's present.

"MR. MUTH:  Well, Judge, it's going not for the truth of the matter asserted, it's going for his knowledge of what to be expecting at the club.

"MR. WAGLE:  I think it's going to the truth of the matter asserted, Your Honor.

"THE COURT:  Well, as long as it's just to indicate what, if anything, he did and it's not being offered for the truth of the matter asserted, it can be admitted.

"Q. (By Mr. Muth) Were you on the lookout for Crips and possibly retaliation?

"A. I mean, I was cautious, but I wasn't looking for it to happen.

"Q. Did you tell the detectives, when you were interviewed on that particular night, that that was something that you were concerned about and looking for?

"A. Yes, sir.

"Q. Okay. And that's because of a conversation that your cousin told you?

"A. Yes, sir."

As the State points out, nowhere did Daniels testify about the specific conversation that Daniels had with June. Moreover, contrary to Deshazer's assertion, the State did not refer to June's warning in closing arguments; it even stated that Daniels

12

knew that the shooting was in retaliation to Brown's death even though "nobody had told" him so. This court, therefore, should not speculate as to which statements are being challenged. See *Robinson*, 293 Kan. at 1027 (refusing to guess which statement to which the defendant was objecting); *State v. Bryant*, 285 Kan. 970, 977-78, 179 P.3d 1122 (2008).

To the extent that any statement attributed to June was introduced into evidence, it does not constitute hearsay. Evidence of an out-of-court statement that is not offered to prove the truth of the matter asserted is not hearsay evidence. *Boldridge v. State*, 289 Kan. 618, Syl. ¶ 12, 215 P.3d 585 (2009). Among the several types of statements that do not constitute hearsay is a statement offered to show its effect on the listener. *State v. Becker*, 290 Kan. 842, 847, 235 P.3d 424 (2010), *superseded by statute on other grounds as stated in State v. Todd*, 299 Kan. 263, 323 P.3d 829 (2014).

Deshazer argues that the testimony was not offered by the State to show Daniels' state of mind but rather to show that Deshazer, in fact, was acting in retaliation of Brown's death. A reasonable reading of the contested testimony simply does not support this contention. Daniels testified that he told officers that he was cautious on the night of the shooting because *he* thought there might be some retaliation for Brown's death. He also testified that he knew independently of Brown's death prior to any conversation with June. The fact that he was cautioned has independent significance because it tends to show the statement's effect on Daniels. See *State v. Race*, 293 Kan. 69, 77, 259 P.3d 707 (2011).

The district court did not err in admitting the contested evidence since the testimony did not run afoul of the hearsay exclusion rule. Since no error occurred, we need not address Deshazer's Sixth Amendment argument.

Affirmed.