IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,343

STATE OF KANSAS,
*Appellee*,

v.

GABINO RUIZ-ASCENCIO,
*Appellant.*

SYLLABUS BY THE COURT

1.

Whether a jury instruction was factually appropriate depends on whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction.

2.

A key element of voluntary manslaughter is provocation sufficient to cause an ordinary person to lose control of his or her actions and reason. Mere words or gestures do not constitute legally sufficient provocation.

3.

An illegal sentence under K.S.A. 22-3504 is one that is imposed by a court without jurisdiction; does not conform to the statutory provision, either in the character or the term of authorized punishment; or is ambiguous with respect to the time and manner in which it is to be served.

Appeal from Lyon District Court; W. LEE FOWLER, judge. Opinion filed December 15, 2017. Convictions affirmed, sentence vacated in part, and case remanded with directions.

1

*Richard W. Johnson*, of Kansas City, Missouri, argued the cause, and *Vincent Rivera*, of Olathe, was with him on the brief for appellant.

*Jonathon L. Noble,* assistant county attorney, argued the cause, and *Amy L. Aranda*, first assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Gabino Ruiz-Ascencio appeals from his convictions for attempted first-degree murder, first-degree murder, aggravated assault, and illegal use of a communication facility. He argues that the district court erred when it did not instruct the jury on voluntary manslaughter and that it imposed illegal sentences when it ordered lifetime postrelease supervision. We affirm his convictions but vacate the portion of his sentence imposing lifetime postrelease supervision and remand for resentencing.

FACTS

The convictions in this case stem from two separate events. The first occurred on March 31, 2013. Sometime in the evening on that date, Ruiz-Ascencio went to the home of Maria Aldrete in Emporia, Kansas. Ruiz-Ascencio was looking for a man named Michael Koy, who had once lived at Aldrete's house. A.N., Aldrete's 11-year-old son, was home that evening and answered the door. Ruiz-Ascencio asked for Koy. When A.N. replied that Koy was not there, Ruiz-Ascencio pointed a gun at A.N.'s head and told him to tell Koy that Ruiz-Ascencio was looking for him. This encounter resulted in Ruiz-Ascencio's aggravated assault conviction.

2

The second event occurred a few weeks later. Late in the night on April 12, 2013, Chris Van Tassel, Aaron Gurley, and Adrian Peralta were driving around together and looking for drugs. The three men eventually went back to Van Tassel's house, where Gurley told the two others that he could contact Ruiz-Ascencio, who might have some drugs. Van Tassel testified that Peralta indicated he did not get along with Ruiz-Ascencio. Gurley testified that Peralta said he had "to clear a few things up" with Ruiz-Ascencio due to a previous confrontation between Ruiz-Ascencio and Koy. Van Tassel and Gurley told Peralta to avoid saying anything about the two of them to Ruiz-Ascencio. Then Gurley contacted Ruiz-Ascencio on his phone via Facebook Messenger and asked if he had any cocaine. Ruiz-Ascencio sent a message back, indicated that he did have cocaine, and showed up at Van Tassel's house soon after.

Van Tassel testified that when Ruiz-Ascencio arrived, Peralta called Koy and asked if he was "ready to hook 'em up." Ruiz-Ascencio, Gurley, and Peralta then each snorted some of Ruiz-Ascencio's cocaine. Van Tassel stated that Ruiz-Ascencio and Peralta then began discussing the conflict between the two of them and that things did not "feel right." Van Tassel felt like "[s]omething was simmering" between Peralta and Ruiz-Ascencio, so he asked everyone to leave. Gurley testified that Van Tassel asked them all to leave because he did not like that Ruiz-Ascencio had a gun.

Gurley, Peralta, and Ruiz-Ascencio left Van Tassel's house and went to Gurley's residence. Koy was living with Gurley at the time. Peralta yelled for Koy to come outside. Koy came out and stood in the back yard with the three other men. Koy's girlfriend, Alice Garcia, who was also at the house, came and stood at the back door. After Koy came outside, Ruiz-Ascencio pulled a pistol from his waistline. Gurley testified that Ruiz-Ascencio pointed the pistol at Peralta while the following exchange took place: Peralta told Ruiz-Ascencio that Ruiz-Ascencio had been "saying you want to fight [Koy] all night . . . here he is" and Ruiz-Ascencio replied "I'm not fighting anymore.

3

I'm done fighting." Peralta then told Ruiz-Ascencio that he should not have brought a gun and said "I'm not afraid of death. I invite it."

Gurley then turned to go back in his house. When he did, he heard eight back-to-back gun shots. Gurley ducked inside and eventually heard a car screeching away. Koy came into the house with a gunshot wound to the leg. Gurley ran outside to see if Peralta had also been shot. Peralta was lying on the ground with a gunshot wound and yelling "[h]e shot me." Peralta later died of complications from the gunshot wounds. Garcia corroborated much of this testimony. She testified that Ruiz-Ascencio indicated he did not want to fight and then pulled out a handgun and fired eight times, hitting Koy in the leg and Peralta in the abdomen.

A jury convicted Ruiz-Ascencio of attempted first-degree murder for the shooting of Koy, first-degree murder for the death of Peralta, aggravated assault for his encounter with A.N., and illegal use of a communication facility for using his cell phone in the commission of cocaine distribution. The district court sentenced Ruiz-Ascencio to 272 months for the attempted first-degree murder, 12 months for the aggravated assault, and 8 months for the use of a communication facility, to be served concurrently, and life in prison with a hard 25 for the first-degree murder, to be served consecutively to the sentence for the attempted murder conviction. The district court imposed lifetime postrelease supervision on all four counts.

Ruiz-Ascencio presents two issues in his appeal: (1) the district court erred in denying his request to instruct the jury on voluntary manslaughter for the first-degree murder and attempted first-degree murder charges; and (2) the district court erred in sentencing him to lifetime postrelease supervision on each count.

ANALYSIS

*Voluntary manslaughter instruction*

Ruiz-Ascencio contends that the district court erred when it denied his request to provide the jury with a lesser included offense instruction of voluntary manslaughter for both the first-degree murder and attempted first-degree murder charges.

The State responds that the facts did not support a voluntary manslaughter instruction.

Our standard of review for jury instruction issues is as follows:

"'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied*, 565 U.S. 1221 (2012).'" *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

The parties agree that the issue was properly preserved and that voluntary manslaughter is a lesser included offense of first-degree murder. The question before us is whether the facts would have supported the instruction.

Whether the voluntary manslaughter instruction was factually appropriate depends on whether "there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction." *Williams*, 303 Kan. at 598-99.

Voluntary manslaughter is "knowingly killing a human being committed: (1) [u]pon a sudden quarrel or in the heat of passion; or (2) upon an unreasonable but honest belief that circumstances existed that justified use of deadly force." K.S.A. 2016 Supp. 21-5404.

Ruiz-Ascencio argues that the facts of this case supported a voluntary manslaughter instruction under K.S.A. 2016 Supp. 21-5404(1) because he shot Peralta and Koy during a sudden quarrel.

We discussed the definition of "sudden quarrel" in *State v. Johnson*, 290 Kan. 1038, 236 P.3d 517 (2010), and again in *State v. Bernhardt,* 304 Kan. 460, 372 P.3d 1161 (2016). "Sudden" means: "1. Happening without warning, unforeseen. 2. Characterized by hastiness; abrupt; rash. 3. Characterized by rapidity; quick; swift." *Bernhardt*, 304 Kan. at 476 (quoting *Johnson*, 290 Kan. at 1048). A "quarrel" is "'[a]n altercation or angry dispute; an exchange of recriminations, taunts, threats, or accusations between two persons.'" *Bernhardt*, 304 Kan. at 475 (quoting *Johnson*, 290 Kan. at 1048).

We have also noted that "'[a] sudden quarrel can be one form of heat of passion'" and explained that "heat of passion" is defined as "'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror, based on impulse without reflection.'" *Bernhardt*, 304 Kan. at 475.

6

A key element of voluntary manslaughter is provocation that is "sufficient to cause an ordinary man to lose control of his actions and his reason." *State v. Hayes*, 299 Kan. 861, 864, 327 P.3d 414 (2014) (quoting *State v. Gallegos*, 286 Kan. 869, 875, 190 P.3d 226 [2008]). "Mere words or gestures . . . do not constitute legally sufficient provocation." 299 Kan. at 866.

In *Hayes*, we considered whether the facts supported a voluntary manslaughter instruction. There, the defendant shot his ex-wife in the back of her head from a foot away after luring her to his house. The defendant had been experiencing months of depression and suicidal ideation and had threatened to kill his ex-wife before he shot her. We held that the record did not support a voluntary manslaughter instruction because "the evidence was compelling that the crime was premeditated and that a confrontation . . . was either intended or foreseeable." Furthermore, any provocation had "consisted at most of words or gestures, which are insufficient grounds for instructing on voluntary manslaughter." 299 Kan. at 866.

More recently, we concluded that a voluntary manslaughter instruction was not factually appropriate when the defendant armed himself, drove to his ex-girlfriend's apartment, climbed her balcony, shot out her sliding glass door, had a conversation with her, and then shot a man who had been sleeping next to her on an air mattress. *State v. Johnson*, 304 Kan. 924, 927-28, 376 P.3d 70 (2016). In *Bernhardt*, 304 Kan. at 477, the facts did not support a voluntary manslaughter instruction when an argument between the victim and defendant consisted of only words or gestures and was not unusual, thus negating any contention that it was sudden, and there was no indication the defendant had "snapped" or "experienced a break from reality." 304 Kan. at 477.  Similarly, in *State v. Brownlee*, 302 Kan. 491, 514, 354 P.3d 525 (2015), a voluntary manslaughter instruction was not factually appropriate when, while the victim had inappropriately touched the defendant's sister and threatened to take defendant's gun and beat him with it, there was

7

no evidence regarding who started the physical fight between the defendant and the victim or what the two men fought about and the dispute was not sudden, but had simmered. In *State v. Woods*, 301 Kan. 852, 878, 348 P.3d 583 (2015), a verbal confrontation was not enough to warrant a voluntary manslaughter instruction. Finally, in *State v. Molina*, 299 Kan. 651, 663-64, 325 P.3d 1142 (2014), we concluded a voluntary manslaughter instruction was not factually appropriate when the defendant had argued with rival gang members in a parking lot, disengaged from the confrontation, and driven for a short distance before following the rival members and shooting at their car.

As in the aforementioned cases, the facts here did not support a voluntary manslaughter instruction because the confrontations between Ruiz-Ascencio and his victims were not sudden and did not constitute legally sufficient provocation. The record shows that Ruiz-Ascencio was angry with Koy and had been looking for him in the weeks leading up to the shooting. The record also indicates that some kind of verbal disagreement arose between Ruiz-Ascencio and Peralta earlier in the evening on the night of the shooting. When Ruiz-Ascencio arrived at Koy's home, Peralta shouted for Koy to come out to where the men were standing and then told Ruiz-Ascencio he could fight Koy as he had wanted to do. Koy said nothing and Peralta made no threats. Peralta only told Ruiz-Ascencio that he was not afraid of death but welcomed it and that Ruiz-Ascencio should not have brought a gun.

Even if we can fairly characterize the interactions between Ruiz-Ascencio and his victims as quarrels, they were not unforeseen, abrupt, or otherwise sudden. The evidence showed that Ruiz-Ascencio had been seeking out a confrontation with Koy for some time and that the friction between Ruiz-Ascencio and Peralta began, at the latest, earlier in the night at Van Tassel's home.

8

Furthermore, the facts do not support a claim that Ruiz-Ascencio was generally acting in the heat of passion. Even if Ruiz-Ascencio acted out of fear, as he maintains, his actions must have been prompted by objectively sufficient provocation to support a manslaughter conviction. While the evidence does indicate that Peralta may have been trying to provoke a fight between Ruiz-Ascencio and Koy, this court's previous caselaw makes it clear that words or gestures are not enough to constitute legally sufficient provocation, and neither Koy nor Peralta had a weapon or attempted a physical attack on Ruiz-Ascencio.

Ruiz-Ascencio argues that there may have been evidence that Peralta lunged at him before the shooting. He relies on the following testimony from defense counsel's cross-examination of Gurley:

"Q: And you had been questioned and/or testified four times on this subject, not including today, correct?

. . . .

"A: Yes.

. . . .

"Q: And do you remember, during that second interview, that you also—you did go ahead and indicate that [Peralta] indicated that I'm not afraid of death, and then you stated he started to walk toward [Ruiz-Ascencio]?

"[Prosecutor]: Objection; form of the question and it's asked and answered.

"[Defense Counsel]: I'm just asking about the second interview, Your Honor.

"THE COURT: I think we've—your compliance with the second interview, so I'm going to overrule the objection.

"[Gurley]: I could have said that, but I went into the house. Like, I don't remember exactly—as I'm saying, I wasn't facing him, so I don't know if he lunged towards him or what happened. I just remember the gunshots.

"[Defense Counsel]: For some reason, you made that statement though, right?

"A: Yes.

. . . .

9

"Q: Mr. Gurley, do you believe your recollection from back then, two years ago, was better then than it would be today?

"A: Yes.

. . . .

"Q: Do you remember for a second time stating that [Peralta] walked towards when the gun came up?

"A: Honestly, no but . . ."

The State argues that, at trial, Gurley repeatedly denied seeing the actual shooting, implying that Gurley could not have known if Peralta stepped towards Ruiz-Ascencio. Furthermore, the State argues, even if Peralta did step forward, he was unarmed and there was no evidence that he or Koy posed a threat to Ruiz-Ascencio, implying that a step forward was not sufficient provocation for a voluntary manslaughter instruction.

A careful review of the record confirms the State's position. Gurley denied seeing the shooting or watching Peralta step towards Ruiz-Ascencio during his trial testimony. Neither of the two other eye witnesses—Garcia or Koy—testified that Peralta stepped toward Ruiz-Ascencio before Ruiz-Ascencio fired the gun. Garcia testified that Koy stood in the yard while Peralta told Ruiz-Ascencio he could fight and Ruiz-Ascencio indicated that he didn't want to fight before Ruiz-Ascencio "pulled out a gun and started shooting." Koy testified that he did not remember anything that happened that evening. Additionally, even if the jury could have concluded that these facts supported Ruiz-Ascencio's claim, Ruiz-Ascencio offers no caselaw that suggests movement towards a defendant, without some kind of greater physical threat, creates legally sufficient provocation to support a voluntary manslaughter conviction.

Because there are no facts or reasonable inferences that can be drawn therefrom to suggest that there was a sudden quarrel or that Ruiz-Ascencio otherwise acted in a heat of

passion, a voluntary manslaughter instruction was not factually appropriate. Because there was no error, we do not address harmlessness.

*Lifetime postrelease supervision*

The district court sentenced Ruiz-Ascencio to lifetime postrelease supervision on each of the four counts. Ruiz-Ascencio argues that this was an illegal sentence under K.S.A. 22-3504 because these periods of supervision do not conform to the applicable statutory provisions.

The State concedes this issue.

Courts may consider an illegal sentence under K.S.A 22-3504 at any time. *State v. Dickey*, 301 Kan. 1018, 1027, 350 P.3d 1054 (2015). Whether the sentence is illegal is subject to unlimited review. *Makthepharak v. State*, 298 Kan. 573, 578, 314 P.3d 876 (2013).

An illegal sentence under K.S.A. 22-3504 is one that (1) is imposed by a court without jurisdiction; (2) does not conform to the statutory provision, either in the character or the term of authorized punishment; or (3) is ambiguous with respect to the time and manner in which it is to be served. *State v. Gray*, 303 Kan. 1011, 1014, 368 P.3d 1113 (2016).

K.S.A. 2016 Supp. 22-3717 describes the mandatory parole and postrelease supervision procedures for inmates. These procedures differ based on the severity level of a crime.

11

Ruiz-Ascencio was convicted on four counts. Counts two, three, and four were a severity level one felony, a severity level seven felony, and a severity level eight felony, respectively. K.S.A. 2016 Supp. 22-3717(d)(1)(A) and K.S.A. 2016 Supp. 22-3717(d)(1)(C) provide that Ruiz-Ascencio was required to serve postrelease supervision periods of 36 months for the level one felony and 12 months each for the severity level seven and level eight felonies. On count one, Ruiz-Ascencio was convicted of first-degree murder. For this crime, K.S.A. 2016 Supp. 22-3717(b)(2)(C) provides that Ruiz-Ascencio was not subject to postrelease supervision but was instead eligible for parole after 25 years.

The district court sentenced Ruiz-Ascencio to lifetime postrelease supervision on all four counts. Because this was contrary to K.S.A. 2016 Supp. 22-3717, Ruiz-Ascencio's sentences are illegal.

Ruiz-Ascencio's convictions are affirmed. Judgment of the district court imposing lifetime postrelease supervision on all counts is vacated, and case is remanded to the district court for resentencing.

JOHNSON, J., concurs in the result.