IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 106,329

STATE OF KANSAS,
*Appellee*,

v.

TYNISHA STORY,
*Appellant*.

SYLLABUS BY THE COURT

1.

Admission of evidence that the serial number of a gun had been obliterated at an unknown time and failure to give a limiting instruction on that evidence under K.S.A. 2013 Supp. 60-455 does not require reversal of the defendant's conviction when the State's other evidence of the defendant's guilt on first-degree murder is strong.

2.

Failure to give a limiting instruction on evidence of the defendant's use of other inmates' telephone personal identification numbers does not require reversal of the defendant's first-degree murder conviction.

3.

A lesser-included offense jury instruction on heat-of-passion voluntary manslaughter is factually inappropriate when there is no evidence before a jury tending to show that a first-degree murder defendant faced provocation sufficient to cause an ordinary person to lose control of his or her actions and reason. The test is objective, not subjective. The hallmark of heat of passion is taking action upon impulse without

1

reflection; it includes an emotional state of mind characterized by anger, rage, hatred, furious resentment, or terror.

4.

On the facts of this case, the prosecutor's reference to school shootings as examples of situations in which a defendant may be convicted of premeditated murder despite being unaware of the exact identities of his or her victims was not misconduct.

5.

Under the facts of this case, the cumulative error doctrine does not require reversal of the defendant's first-degree murder conviction.

Appeal from Wyandotte District Court; THOMAS L. BOEDING, judge. Opinion filed September 5, 2014. Affirmed.

*Joanna Labastida*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellee.

*Jennifer S. Tatum*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellant.

The opinion of the court was delivered by

BEIER, J.: Defendant Tynisha Story appeals her first-degree murder conviction in the January 1, 2010, shooting death of Lakeasha Ross, a social guest of Story's girlfriend, Ela Bartley. The district court judge sentenced Story to a hard 25 life sentence.

Story raises several issues that we have combined: (1) admission of and failure to give limiting instructions on evidence of other crimes or civil wrongs; (2) failure to

instruct on voluntary manslaughter; (3) prosecutorial misconduct arising from references to school shootings during closing argument; and (4) cumulative error.

None of the issues raised by Story requires reversal of her conviction, and we affirm the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

Story and Bartley dated nonexclusively for several years. On December 31, 2009, Bartley and her two sisters, Jonice Dickerson and Talisa Silas, attended a party at Story's mother's house. Bartley had driven to the party, but Story drove the three sisters home. After dropping the sisters off at their apartment, Story left in Bartley's car.

The three sisters stayed up talking and watching movies. At some point, Ross, a woman Bartley had dated for "a couple of days" several years earlier, called Bartley and said she was coming over. Once Ross arrived, the women continued to talk and watch movies. Silas would later testify that Story called Bartley several times during this period. Eventually everyone went to sleep: Bartley and Ross in one bedroom and Dickerson in another; Silas slept in the front room.

The next morning, as Silas awoke, she heard Bartley tell Ross that Ross needed to leave before Story returned the car. About this time, Story called to tell Bartley she was coming over; Bartley said "OK" and hung up. Within minutes, Bartley called Story back to tell her that she "had company" and that Story could keep the car until the "company was gone." Bartley again told Ross that she needed to leave because Story was on her way.

Not long after the second call, Story arrived at Bartley's apartment. Without knocking, Story used Bartley's keys to enter. Bartley and Silas would later testify that,

3

upon entering, Story looked around the room and, without saying a word, began shooting at Ross. Story fired approximately four shots before Bartley pushed her out the door.

Bartley's versions about what happened next differed from one another. At trial, she and Silas would testify that Story stopped shooting when she was pushed out the door. But, immediately after the shooting, Bartley told Detective Clayton Bye that Story pushed her back "and just started shooting at least four more times. And I finally just— 'cause she was at the doorway—and I finally just pushed her out and locked it."

After Story was outside the apartment, both Bartley and Silas called 911.

Officer Scarlet McConnell was the first officer to arrive on the scene. She found the apartment with the front door open and the three sisters inside screaming. Seeing Ross lying on the floor, McConnell immediately went to check Ross' pulse and found that she was dead.

Based on statements given by Bartley and her sisters, police developed several leads on Story's whereabouts. Police contacted their counterpart in Kansas City, Missouri, for assistance. Based on a tip, police officers in Missouri followed a vehicle to a house where a passenger who matched Story's description jumped out and ran inside. The officers secured the area and waited for backup.

After backup arrived, officers knocked on the front door. Edward Chism, Story's uncle, answered and allowed the officers inside. The officers found Story and arrested her. After Story's arrest, Chism consented to a search of the house. Officers found a nickel-plated gun in a pile of clothes in one of the bedrooms, which, according to Chism, was not his. A ballistics test would later match the gun to shell casings and bullet fragments found at the crime scene.

4

Ross' autopsy report stated that she had been hit by eight shots: one in the head, one in the left shoulder, four in the left side of her chest, one in the back of her left arm, and one in her right thumb. Of the eight shots, at least four would have been fatal. The location of the wounds demonstrated that Ross was in a defensive position and trying to shield herself when she was shot.

Story's first trial ended in a hung jury.

At Story's second trial, Officer Claude Harper testified to his observation of the missing serial number of the gun found at Chism's and explained how removal of such a number makes it more difficult to determine who purchased the gun. He also described the method that may have been used to remove the particular gun's serial number.

Story did not object to Harper's initial testimony. But, at a later bench conference before Harper left the stand, Story's counsel asserted that the evidence about the serial number's removal should not have been admitted. Counsel said he could not remember if the district judge had ruled on the admissibility issue previously. The prosecutor said that the district judge had held that the evidence would be admissible. The district judge acknowledged that the gun had been admitted into evidence at the first trial, and he said his notes indicated that the serial number had been filed off. The prosecutor then said:

> "My memory's very clear [Story's counsel] has objected to this continuously from the get-go, I mean throughout the last trial through now. It's my understanding he had a continuing objection to that and I would never dispute that for appellate purposes. And it has been admitted. The court had ruled it was admissible. The reason the State admitted that point, which is similar to the reason that we're admitting negative DNA and negative fingerprint evidence is because this gun was recovered, and as you might remember at the last trial which resulted in a hung jury, [Story's counsel] was allowed to argue you can't trace that to the defendant, you can't do it. I want to make, you know—I want it to be clear to the jurors that they tried to do everything they could . . . to [tie] that gun.

5

However, I never argued last time that it was herself that filed it off, never. I never made that [argument] and I don't intend to this time."

After reviewing his notes from the first trial, the district judge asked the prosecutor if she planned to present KBI testimony about how the serial number had been removed. The prosecutor said she did. The district judge then concluded the bench conference: "Well, let's put it this way . . . at this point I take what [Story's counsel is] saying as an objection to any further testimony about that. And based upon the discussion we had here, that motion would be overruled."

KBI firearm expert David Wright testified later in Story's second trial about the filed-off serial number, volunteering that it had been "obliterated" while giving a general description of the gun. Later, when the prosecutor asked Wright about the utility of gun serial numbers in identifying gun owners and about the chemical process Wright had used in his attempt to restore the visibility of the serial number of this particular gun, Story's counsel did not object. On cross-examination, Wright was again asked about the serial number.

Story's counsel did object to testimony about Story's use of another inmate's telephone personal identification number (PIN) while in jail. Detective Sherry Anderson Simpson testified for the State about several telephone calls Story had made. When asked about the PIN Story had used to make a particular call, Anderson responded: "And I apologize because she's used several people's PIN numbers." Story's counsel made an objection at the bench to any testimony about the use of other inmates' PINs because it was evidence of another crime. The district judge overruled the objection. Simpson further testified that inmates use other inmates' PINs in an attempt to hide their identity.

Story requested a heat-of-passion voluntary manslaughter jury instruction based on a quote from one of the recorded telephone calls admitted by the State. In the call, an unidentified woman said to Story:

"I believe you because I'm like when you came in, I just you was yourself when you came in, but like as soon as you stepped in the mother fucking door like your whole face like turned a different mother fucking color, like—I'm like you wasn't even your mother fucking self because I know you. I know you from any fucking body."

Story's counsel argued that this passage supported a theory that Story acted in the heat of passion. After hearing argument from the State, the district judge rejected the requested instruction.

During the defense's closing argument, Story's counsel challenged the sufficiency of the State's evidence of premeditated murder. Counsel also tried to distinguish Ross' murder—where the evidence showed Story did not know specifically that Ross was at the apartment—from cases that qualified as clearer examples of premeditation—such as cases in which the killer lies in wait for a specific victim.

The State addressed this argument during the rebuttal portion of the prosecutor's closing argument:

"Before I continue on, I just want to tell you something about premeditation. You don't have to know someone's there before it happens to premeditate on killing someone. All of us can think of examples of that. Quick one, school shootings. How many of those have we had? People who go to these schools, they bring a gun and they have no idea who's coming in and out of that school like at Virginia Tech or Texas and yet not a single one of us in this room would doubt that they went there with the intent to kill somebody for whatever their reasons are. You can all think of examples of that. That's not a requirement, it's not in the law and we promised not to read things into the law that aren't there.

7

"Fact is she knew company was over, she knew what it meant. There are some facts that might suggest she didn't know Ms. Ross was over there, but I don't have to prove that to you beyond a reasonable doubt. Fact is she was going to kill whoever was there. She was going to kill whoever was there and she does not have to know specifically it's Lakeasha Ross to form the intent to kill somebody, and that is common sense."

Also during the rebuttal portion of the State's closing argument, the prosecutor mentioned the serial number on the gun, in the context of investigators' various attempts to find direct evidence tying Story to the weapon.

EVIDENCE OF OTHER CRIMES

Story argues that evidence of the filed-off serial number on the gun constituted evidence of another crime under K.S.A. 2010 Supp. 60-455 and that the district judge failed to follow the statute and erred in interpreting caselaw on admission of, and jury instruction for, such evidence. The State has chosen not to contest Story's characterization of the evidence as evidence of another crime; so we accept that characterization for purposes of this appeal. The State also does not contest that the "evidence does not appear to be admissible pursuant to K.S.A. 60-455." Although this court is not bound by a party's concession on a question of law, we accept this concession for purposes of this appeal because it is not, ultimately, dispositive.

In its brief, the State does challenge Story's preservation of this issue, arguing that the lack of a contemporaneous objection, apparently to Harper's initial testimony, means we should not reach this issue's merits. But the prosecutor stated at trial that she understood there to be a continuing objection already in place and that she "would never dispute that for appellate purposes." We hold the State to its trial concession of the fact of the prior existence of a continuing defense objection to admission of Harper's initial

8

testimony. In addition, later testimony by Harper and similar evidence admitted through Wright also would have been admitted subject to the continuing objection.

The State's lone substantive response on this issue is that K.S.A. 2010 Supp. 60-455 only applies to crimes that occurred at a time other than that of the charged crime. In its view, both the charged murder and the crime of obliterating the serial number of a gun occurred simultaneously. Although K.S.A. 21-4205(b) makes possession of a gun with an obliterated serial number prima facie evidence that the possessor is the one who obliterated the number, the criminal act is the obliteration itself. See K.S.A. 21-4205(a). Because there is no evidence in the record even tending to show when the gun's serial number was removed, let alone that Story performed the obliteration while committing the murder, the State's fact-based argument is unpersuasive.

This brings us to harmlessness. In general, the nonconstitutional harmlessness standard of K.S.A. 2010 Supp. 60-261 is applicable to violations of K.S.A. 2010 Supp. 60-455. See *State v. Preston*, 294 Kan. 27, 35-36, 272 P.3d 1275 (2012). Under that standard "the burden of demonstrating harmlessness is on the party benefitting from the error. That party must show there is no reasonable probability the error affected the trial's outcome in light of the entire record." *State v. McCullough*, 293 Kan. 970, Syl. ¶ 9, 270 P.3d 1142 (2012).

The evidence of the filed-off serial number consisted of statements by two witnesses explaining their efforts to trace the gun's ownership. The gun itself was admitted into evidence, and there is no indication that Story objected to its admission. The State never implied that it was a crime for Story to be in possession of such a gun, or that she had personally filed off the serial number at any particular time. Possession of such a gun is not a violent crime. Nor is it a crime whose mere mention is inherently prejudicial. Although the prosecutor did reference the obliterated serial number during closing, the context was its possible relationship to concealment. This is a far cry from

9

suggesting that a person who would remove a gun's serial number has a propensity to commit first-degree murder.

Moreover, the other evidence against Story was strong. Two eyewitnesses testified to seeing Story come in the apartment without knocking and immediately start shooting at Ross. The eyewitness accounts were consistent with evidence found at the crime scene. The autopsy indicated that Ross was in a defensive position when she was shot. And the ballistics analysis indicated that the gun found where police arrested Story was the one used in the shooting.

In light of the entire record, there is no reasonable probability the error affected the trial's outcome. Any error in admitting the evidence of the filed-off serial number was harmless.

Story also makes a K.S.A. 2010 Supp. 60-455 limiting instruction argument on evidence that she used other inmates' PINs to make telephone calls while in jail awaiting trial. Again, regardless of whether the district judge erred by failing to give a limiting instruction on this evidence, any such error would have been harmless on the record before us. Even if Story's use of other inmates' PINs qualified as a violation of a jail policy or rule, we are confident the jury's awareness of it did nothing to contribute to Story's conviction for first-degree murder.

VOLUNTARY MANSLAUGHTER INSTRUCTION

At the conclusion of evidence, Story requested a heat-of-passion voluntary manslaughter instruction.

We outlined the framework for analyzing jury instruction issues in *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012):

10

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward,* 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)."

In addition, generally "a defendant is entitled to instructions on the law applicable to his or her defense theory if there is sufficient evidence for a rational factfinder to find for the defendant on that theory." *State v. Friday*, 297 Kan. 1023, Syl. ¶ 10, 306 P.3d 265 (2013). This court views the evidence that would have supported the instruction in the light most favorable to the defendant. 297 Kan. 1023, Syl. ¶ 10.

Our first inquiry focuses on reviewability. "To fully preserve a claim that the district court erred in failing to give a lesser included offense instruction, the defendant must distinctly state an objection to the omission before the jury retires to consider its verdict. K.S.A. 22-3414(3)." *State v. Wade*, 295 Kan. 916, 924, 287 P.3d 237 (2012). Story fulfilled her obligation to preserve this issue.

Next, we determine whether the requested instruction was legally appropriate. Voluntary manslaughter is a lesser included offense of first- and second-degree murder, and therefore an instruction on its elements was legally appropriate. See *Wade*, 295 Kan. at 924; *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008).

On whether the instruction was factually appropriate, *i.e.*, "'there [was] some evidence which would reasonably justify a conviction of some lesser included crime,'"

*Plummer*, 295 Kan. at 161, we do not "speculate about hypothetical scenarios." *Wade*, 295 Kan. at 925. "[F]or a lesser included offense to be factually appropriate, there must be actual evidence in the record, together with reasonable inferences to be drawn from that actual evidence, that would reasonably support a conviction for the lesser crime." 295 Kan. at 926.

The form of voluntary manslaughter instruction sought here would have defined the crime as an "intentional killing of a human being committed . . . [u]pon a sudden quarrel or in the heat of passion." K.S.A. 21-3403(a). "'Sudden quarrel is one form of provocation for "heat of passion" and is not separate and apart from "heat of passion."'" *State v. Johnson*, 290 Kan. 1038, 1047, 236 P.3d 517 (2010) (quoting *State v. Coop*, 223 Kan. 302, 307, 573 P.2d 1017 [1978]). The provocation—whether it be "sudden quarrel" or some other form of provocation—must be sufficient to cause an ordinary person to lose control of his or her actions and reason. *Johnson*, 290 Kan. at 1047. The test is objective, not subjective. *State v. Hill*, 290 Kan. 339, 356, 228 P.3d 1027 (2010). In addition, we have defined "heat of passion" as "'"any intense or vehement emotional excitement of the kind prompting violent and aggressive action."' [Citations omitted.]" *Wade*, 295 Kan. at 925. "The hallmark of heat of passion is taking action upon impulse without reflection." 295 Kan. at 925. It "'includes an emotional state of mind characterized by anger, rage, hatred, furious resentment, or terror.'" *Coop*, 223 Kan. 302, Syl. ¶ 1.

Story relies on her telephone caller's statements that Story did not look like herself to support the necessity of a voluntary manslaughter instruction. To the extent that this is evidence of Story's emotional state of mind at the time of the shooting, it merely establishes her subjective state of mind. The evidence does not demonstrate an objective basis for finding that she acted in the heat of passion.

Further, the other evidence introduced at trial also does not establish any objective basis for instructing on heat of passion. Eyewitness testimony, corroborated by the physical evidence, demonstrated that Story began shooting immediately after she entered the apartment. Ross was shot while sitting in a chair, and her injuries indicated she was shot in a defensive position; she had turned away and tried to cover her face with her hands. Any objective provocation Story was reacting to would have had to have occurred before she arrived at the apartment. Before Story arrived, all she knew was that Bartley had "company." There was no evidence that Story knew that Bartley and her "company" were or had been intimately involved or even that Story's relationship with Bartley was such that fidelity could be expected. See *State v. Hilt*, 299 Kan. 176, 195, 322 P.3d 367 (2014); *Wade*, 295 Kan. at 925.

Although Story and Bartley may have had a passionate relationship, as Story contends, there is no evidence in the record that, in combination with reasonable inferences, would reasonably support a conviction of voluntary manslaughter. The district judge correctly refused to give that lesser included offense instruction.

PROSECUTORIAL MISCONDUCT

Our review of a claim of prosecutorial misconduct is a two-step process:

> "'The appellate court first decides whether the comments were outside the wide latitude a prosecutor is allowed, *e.g.,* in discussing the evidence. If so, there was misconduct. Second, if misconduct is found, the court must determine whether the improper comments prejudiced the jury and denied the defendant a fair trial.'" *State v. Dull*, 298 Kan. 832, 836, 317 P.3d 104 (2014).

In determining whether the defendant has been so prejudiced that a new trial should be granted, this court considers three factors:

"'(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. Under *Tosh,* none of these three factors is individually controlling. And before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), have been met.' *State v. Bridges,* 297 Kan. 989, Syl. ¶ ¶ 14, 15, 306 P.3d 244 (2013)." *Dull*, 298 Kan. at 836.

This court begins with the constitutional harmlessness analysis when both the constitutional and nonconstitutional errors arise from the same acts and omissions. 298 Kan. at 837. If the constitutional error requires reversal of a defendant's conviction, it is unnecessary to conduct the nonconstitutional harmlessness analysis. 298 Kan. at 837.

Under the constitutional harmless error analysis, as defined in *Chapman*,

""'the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e*., where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward,* 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).'" *Dull*, 298 Kan. at 836.

This court will consider a prosecutorial misconduct claim based on statements made during closing argument even without a defense objection at trial. *State v. King*, 288 Kan. 333, 344-45, 204 P.3d 585 (2009).

In response to comments made about premeditation by defense counsel in closing arguments, the prosecutor used school shootings as examples of crimes in which the perpetrators do not necessarily know exactly who their victims will be. The point was that premeditation still can be demonstrated under governing law. Story argues that these

14

statements were outside the wide latitude given to prosecutors discussing the evidence during closing arguments because they were "calculated to play to the jurors' emotions" and "inflame the passions of the jury" by "equating [the crime here] to a horrific school shooting."

"In closing argument, a prosecutor may draw reasonable inferences from the evidence but may not comment on facts outside the evidence." *State v. Novotny*, 297 Kan. 1174, Syl. ¶ 7, 307 P.3d 1278 (2013). A prosecutor may not make comments "intended to inflame the passions or prejudices of the jury or divert the jury from its duty to decide the case based on the evidence and the controlling law." *State v. Raskie*, 293 Kan. 906, Syl. ¶ 3, 269 P.3d 1268 (2012). "But a prosecutor may use 'analogies, similes, allusions (be they historic, poetic, literary, or scientific), and other rhetorical devices' in an attempt 'to bring order to the facts presented at trial, place them in a meaningful context, and out of this collection of bits and pieces construct the whole of a case.' *State v. Henderson*, 32 Kan. App. 2d 1202, 1210, 96 P.3d 680 (2004)." *Hilt*, 299 Kan. at 198.

In this case, the prosecutor could have chosen a different historical reference to make her point, but we cannot say that the statement exceeded the wide latitude afforded a prosecutor during closing. Story's counsel had attempted to persuade the jury that the State's evidence of premeditation was insufficient because Story did not know the identity of Bartley's guest. The prosecutor used the school shootings only as clear examples of premeditated killings in which the shooter does not know the specific victims. The prosecutor did not suggest that Story's crime was comparable in any other of its characteristics and did not make any comments about the factual details of any school shooting. We hold, therefore, that there was no prosecutorial misconduct.

15

CUMULATIVE ERROR

Story's final argument on appeal is that "the cumulative effect of the district court's errors mandates a new trial."

> "Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. *State v. Dixon,* 289 Kan. 46, 71, 209 P.3d 675 (2009)." *State v. Hart*, 297 Kan. 494, 513-14, 301 P.3d 1279 (2013).

We have identified only one error, admission of and failure to instruct on the evidence that the gun's serial number had been obliterated. We have merely assumed instruction error on the evidence that Story used other inmates' telephone PINs. Even when these two items are considered together, in the context of the record as a whole, any prejudicial effect flowing from them would have been minimal to nonexistent. See *State v. Tully*, 293 Kan. 176, 205-06, 262 P.3d 314 (2011) (appellate court examines errors in context of record as whole; court considers strength of evidence). Story received a fair trial untainted by cumulative error. See *State v. Magallanez*, 290 Kan. 906, 926, 235 P.3d 460 (2010) (totality of circumstances examined; fair trial as touchstone for reversal).

CONCLUSION

We affirm the judgment of the district court.

MORITZ, J., not participating.
MICHAEL E. WARD, District Judge, assigned.[1]

[1]**REPORTER'S NOTE:** District Judge Ward was appointed to hear case No. 106,329 vice Justice Moritz pursuant to the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.