NOT DESIGNATED FOR PUBLICATION

No. 113,044

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JALEN J. JONES,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Opinion filed March 4, 2016. Affirmed.

*Samuel Schirer*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., SCHROEDER, J., and BURGESS, S.J.

*Per Curiam*:  Jalen J. Jones appeals his convictions of attempted first-degree murder and aggravated battery. Jones claims the district court erred when it denied his requests to instruct the jury on defense of a person and the lesser offense of attempted voluntary manslaughter. He also raises constitutional challenges to Kansas' criminal restitution scheme for the first time on appeal. For the reasons set forth herein, we affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

On the evening of August 24, 2013, Chandria Young was spending time at the house of her friend, Autumn Ashlock. Later that night, the two women were joined by three men, Quentin Lawrence, also known as Ratchet; Daijour Parker, also known as DP; and Dominque Gordon, also known as Bully. The three men were members of the Piru Blood gang. Young was in a relationship with Gordon, and Ashlock was in a relationship with Lawrence.

Eventually, Ashlock drove the group to QuickTrip to purchase cigarettes. While at QuickTrip, Gordon saw Young talking to Aquarius Hurt, who was a member of a rival gang called the Gangster Disciples, or GDs. Gordon approached Hurt. The two men exchanged insults, and Gordon eventually punched Hurt in the face. Young, Ashlock, Parker, and Lawrence grabbed Gordon, placed him into their car, and the group returned to Ashlock's house.

After the incident at QuickTrip, Hurt called Jones, his brother, and told him what had happened. Jones was with his friend, Joshua Grier. Hurt said that he was mad about the incident and asked Jones and Grier to come pick him up. Grier, who was driving his gray Taurus, agreed to do so. Jones was carrying a .40 Hi-Point semiautomatic gun, and Grier had a .380 Bersa, also a semiautomatic weapon.

Jones, Hurt, and Grier initially drove to Young's house to try to find Gordon, but no one was there. The three men then proceeded to drive to Ashlock's house. Ashlock, Young, Lawrence, Parker, and Gordon were sitting on Ashlock's porch when Grier, Jones, and Hurt pulled up in the street in front of the house. All three men immediately got out of Grier's car. The two women, Ashlock and Young, initially approached the men. Hurt eventually told Lawrence, Parker, and Gordon to come to the street. Hurt said something about finishing what they had started at QuickTrip.

2

Lawrence, Parker, and Gordon came down to the street. At this time, Jones and Hurt were standing toward the back of the car on the passenger side. Gordon approached Grier and the two men squared off to fight, but Young and Ashlock tried to stop the altercation from becoming physical. As this occurred, Lawrence was standing in front of a white truck parked in the street; Parker also was standing in the street. Neither Lawrence nor Parker got involved in the altercation between Gordon and Grier. Lawrence, Parker, and Gordon were unarmed. As Young and Ashlock continued their efforts to separate Gordon and Grier, numerous gunshots were fired in rapid succession. Young saw two shooters firing from behind Grier's vehicle, where Jones and Hurt had been standing. Ashlock, meanwhile, saw that Jones and Hurt were, in fact, the shooters.

Lawrence was struck by five of the gunshots; he was shot twice in the arm, and once each in the neck, stomach, and back. From Young's vantage point, she could see that at least some of the shots were fired at Lawrence after he was already lying on the ground. After the shooting stopped, Grier, Jones, and Hurt fled the scene in Grier's car. Young and Parker ran to Lawrence and used shirts to apply pressure to his neck to control the bleeding.

After fleeing the scene of the shooting, Jones, Hurt, and Grier met up with Tenacious Sargent, Jones and Hurt's mother. Jones and Hurt were each holding a gun. Jones told his mother, "We did something and I'm sorry." Sargent eventually took the guns, placed them in a plastic bag, and hid them in a vacant garage down the street.

Jones, Hurt, and Grier next went to the house of their friend, Mikalia Smith. The men woke up Smith, and Jones asked her to say that the men had been at her house since 10 p.m. All three men showered and changed clothes at Smith's house. Sargent also came to Smith's house and told her to tell police that Jones, Grier, and Hurt had been at the house since 10 p.m. eating pizza, watching television, and playing video games.

3

Later, police arrived and transported everyone to the police station. Sargent eventually informed police of the location of the guns and took them there. Crime scene investigators recovered the plastic bag from the garage. In the bag, investigators found a .380 Bursa and a .40 Hi-Point semiautomatic weapons with ammunition for each gun. Investigators later conducted firearm analysis on the weapons and the shell casings that were recovered at the scene of the shooting. Four of the shell casings that were recovered were fired from the .40 caliber Hi-Point. Six other shell casings that were recovered were fired from the .380 Bursa. A bullet that was recovered from the pool of blood where Lawrence was lying was fired from the .380 Bursa. A bullet that was recovered from Lawrence's body also was fired from the .380 Bursa.

The State ultimately charged Jones with attempted first-degree murder and aggravated battery. At trial, Jones testified on his own behalf. Jones testified that when he, Grier, and Hurt arrived at Ashlock's house, he initially stayed inside Grier's car. According to Jones, Grier and Gordon squared up, "acting like they're going to fight." Jones claimed that it was at this point that he first exited the car. He testified that he walked to the back of the car, holding the .40 caliber gun behind his back. As Jones stood at the rear of the car, Lawrence asked him if he was Scarface, a reference to Jones' nickname. At that point, Gordon said, "If that's Scarface, shoot him down."

Jones testified that he was not paying attention to Lawrence at the time, as he was instead focused on the confrontation between Gordon and Grier. Jones claimed that Young began pushing Grier toward the Taurus, so Jones began backpedaling toward the car as well. Jones testified that he, Young, Ashlock, and Hurt all yelled for Grier to get in the car. Jones acknowledged that he never saw any of the other men with guns, but he testified that Lawrence and Parker had their hands in their pants as if they had guns.

Jones testified that he started the engine of the Taurus. He claimed that Hurt already was in the car by this point. As Grier was trying to get inside the car, Jones saw

4

his head move towards him. Jones thought that Gordon had hit Grier, so he got out of the car carrying both the .40 caliber and the .380 caliber guns.

Jones testified that he opened fire with both guns. According to Jones, he was not trying to hit anyone; instead he was aiming at a white truck, which is where he had seen Lawrence standing with his hands in his pants. Jones testified that he fired the .40 caliber gun until it jammed, at which point he started shooting the .380 caliber weapon. He testified that people began running when he started shooting, and he stated that he continued firing as they fled. When asked why he kept shooting, Jones replied that he "just wanted them to leave." Jones reiterated that he did not intend to shoot anyone. On cross-examination, Jones acknowledged that he initially exited the Taurus with his .40 caliber gun before any threats had been made against him. He also admitted that no one ever pulled a gun on him or struck him at the scene of the shooting.

At the jury instruction conference, Jones requested an instruction on defense of a person. However, the district court ruled that the instruction was not supported by the evidence. The district court instructed the jury on the lesser offense of attempted second-degree murder. Jones also requested a jury instruction on the lesser offense of attempted voluntary manslaughter. However, the district court ruled that the evidence did not support an instruction on that charge.

The jury convicted Jones of attempted first-degree murder and aggravated battery. The district court sentenced Jones to 176 months' imprisonment for the attempted murder conviction and 41 months' imprisonment for the aggravated battery conviction, with the sentences to run concurrently. The district court also ordered Jones to pay restitution in the amount of $2,662. Jones did not object to the imposition of or the amount of restitution. Jones timely appealed the district court's judgment.

Jones first claims the district court erred when it denied his request to instruct the jury on defense of a person. Jones argues that when the evidence is viewed in the light most favorable to him, he was acting in defense of himself or Grier when he started shooting. Jones argues that his use of deadly force was justified because his life had been threatened during the altercation between Gordon and Grier, and Jones' retreat to Grier's car before he started shooting did not take away the immediacy of the threat.

The State argues that the district court did not err because giving a defense of person instruction would have been factually inappropriate. First, the State argues that the instruction was factually inappropriate because Jones was the initial aggressor since he went to Ashlock's house to start a fight and he had his gun out before any fight started. Second, the State argues the instruction was factually inappropriate because Jones, Grier, and Hurt were engaged in mutual combat with Parker, Lawrence, and Gordon. Third, the State argues the instruction was factually inappropriate because the evidence did not support both a subjective and objective belief by Jones that deadly force was necessary to defend Jones or another person against the imminent use of deadly force.

In analyzing jury instruction issues, appellate courts employ a multistep standard of review:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert.*

*denied* 132 S. Ct. 1594 (2012).' [Citation omitted.]" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

A criminal defendant generally is entitled to instructions on the law applicable to his or her theory of defense if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. If the defendant requests an instruction at trial, the court must review the evidence in the light most favorable to the defendant. *State v. Hilt*, 299 Kan. 176, 184, 322 P.3d 367 (2014).

Apply the four-step analysis, we first note that Jones requested the instruction on defense of a person at trial preserving the issue for appeal. Second, neither party disputes the fact that a defense of person instruction is legally appropriate in a murder or attempted murder prosecution. *State v. Knox*, 301 Kan. 671, 677-78, 347 P.3d 656 (2015).

The determinative issue is whether a defense of person instruction is factually appropriate in this case. A requested instruction on defense of a person is factually appropriate if there is sufficient evidence, when viewed in the light most favorable to the defendant, for a rational factfinder to find for the defendant on that theory. *State v. Story*, 300 Kan. 702, 710, 334 P.3d 297 (2014). Sufficiency is examined against the legal elements of defense of a person, which are defined in K.S.A. 2015 Supp. 21-5222. Under that statute, the use of force can only be justified to the extent a person "reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force." K.S.A. 2015 Supp. 21-5222(a). The use of deadly force, meanwhile, can only be justified to the extent a person "reasonably believes deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person." K.S.A. 2015 Supp. 21-5222(b). These subsections establish a two-part test, the first of which is subjective, as it requires a showing that the defendant sincerely and honestly believed the use of deadly force in defense of a person was

7

necessary. The second part is objective, as it requires a showing that a reasonable person in the defendant's circumstances would have perceived the use of deadly force in defense of a person was necessary. *State v. Salary*, 301 Kan. 586, 593-94, 343 P.3d 1165 (2015).

K.S.A. 2015 Supp. 21-5226(c), however, provides that an aggressor, *i.e.*, one who initially provokes the use of force against himself or herself, may claim self-defense under K.S.A. 2015 Supp. 21-5222 only in limited circumstances. The statute reads in relevant part:

> "The justification described in . . . K.S.A. [2015 Supp.] 21-5222 . . . is not available to a person who:
>
> . . . .
>
> "(c) otherwise initially provokes the use of any force against such person or another, unless:
>
> (1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or
>
> (2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force." K.S.A. 2015 Supp. 21-5226(c).

Jones argues that the district court erred in denying his request to instruct on defense of a person. In his packet of proposed instructions, Jones requested that the district court instruct the jury on defense of another. However, at the jury instruction conference, Jones focused solely on self-defense. Jones argued that the instruction was appropriate because there was evidence that Lawrence and Parker had their hands in their pants as if they might be holding guns and Gordon told Lawrence to shoot Jones if he was Scarface. There was also evidence at trial that earlier in the day Lawrence had made documented efforts to obtain a gun.

8

Even considering the evidence in the light most favorable to Jones, we agree with the district court that a jury instruction on defense of person would have been factually inappropriate in this case. First, the evidence showed that Jones was an initial aggressor. After hearing what had happened at the QuickTrip, Jones, Hurt, and Grier went to two locations in order to locate the man who had punched Jones' brother. While Jones claims that he had no intention of starting a fight, his own testimony showed that he held a loaded gun behind his back when he stepped out of the car upon arriving at Ashlock's house. In other words, Jones had the weapon in his hand *before* Gordon allegedly made a threatening comment and *before* Jones claimed to have seen Lawrence and Parker with their hands in their pants. In such circumstances, Jones was the aggressor as identified by K.S.A. 2015 Supp. 21-5226 and was not entitled to a self-defense instruction.

Moreover, the instruction was not appropriate because, at a minimum, Jones, Hurt, and Grier willingly engaged in mutual combat with Lawrence, Parker, and Gordon. Mutual combat has been defined as one into which both the parties enter willingly or voluntarily; it implies a common intent to fight, but not necessarily an exchange of blows. *State v. Coop*, 223 Kan. 302, 306, 572 P.2d 1017 (1978) (quoting Black's Law Dictionary 332-33 [Rev. 4th ed. 1968]). In *State v. McCullough*, 293 Kan. 970, 975-76, 270 P.3d 1142 (2012), our Supreme Court stated:

"The doctrine of self-defense cannot excuse a killing done when the defendant willingly engaged in mutual combat unless the defendant has withdrawn in good faith and done everything in the defendant's power to avert the necessity of the killing. [Citation omitted.] This rule does not destroy the right to self-defense in all mutual combat cases; but for self-defense to justify the killing, the defendant must be acting 'solely for the protection of [the defendant's] own life, and not to inflict harm upon [the defendant's] adversary.' [Citations omitted.]"

Furthermore, a jury instruction on defense of person would have been factually inappropriate because the evidence does not support both a subjective and objective

9

belief by Jones that deadly force was necessary to defend himself against the imminent use of deadly force by another. The evidence was undisputed that Lawrence, Parker, and Gordon were unarmed, and Jones never saw the men display any weapons. All Jones saw was that Lawrence and Parker had their hands in their pants, and the evidence showed that the two men were dressed in gym shorts. Even after Jones allegedly heard Gordon say, "If that's Scarface, shoot him," Jones did not subjectively believe that the use of deadly force was necessary to defend himself. Jones testified that he was not paying attention to Lawrence at the time, as he was instead focused on the confrontation between Gordon and Grier. In other words, after hearing the threat, Jones simply continued to watch Gordon and Grier circle each other in the street.

Jones testified that he eventually made his way back toward the car as Ashlock and Young tried to separate Gordon and Grier. Jones testified that he, Young, Ashlock, and Hurt all yelled for Grier to get in the car. According to Jones, it was not until he thought he saw Gordon hit Grier that he got back out of the car with the two guns and started shooting.

But the main reason a defense of person instruction would have been factually inappropriate in this case is because Jones unequivocally testified that he never intended to shoot anyone. Our Supreme Court has held that a defendant cannot unintentionally act in self-defense. *State v. Collins*, 257 Kan. 408, 419, 893 P.2d 217 (1995). Self-defense is the intentional use of reasonable force to fend off an attacker. *State v. Bradford*, 27 Kan. App. 2d 597, Syl. ¶ 4, 3 P.3d 104 (2000). As this court has previously stated, "a victim acting in self-defense intends to inflict injury on the attacker." *Manning v. State*, No. 105,699, 2012 WL 3289951, at *3 (Kan. App. 2012) (unpublished opinion) (citing *Bradford*, 27 Kan. App. 2d at 602).

Jones testified that he did not intend to shoot anyone. Instead, Jones testified that he just wanted people to go away. That is why he fired his weapons at the white truck and

he did not fire directly at Lawrence or Parker. Jones' testimony that he was not trying to hit anyone with the shots is logically inconsistent with a claim that he subjectively believed deadly force was necessary. Therefore, the district court did not err when it denied Jones' request for a defense of person instruction.

## LESSER OFFENSE OF ATTEMPTED VOLUNTARY MANSLAUGHTER

Next, Jones claims the district court erred when it denied his request to instruct the jury on the lesser offense of attempted voluntary manslaughter. Jones argues an instruction on attempted voluntary manslaughter was appropriate because he had an honest but unreasonable belief that the use of deadly force was justified. The State argues that this instruction was inappropriate because Jones was the initial aggressor and the evidence showed that Jones did not have a subjective fear that his life was in danger.

We previously set forth the multistep standard of review in analyzing jury instruction issues. Voluntary manslaughter is a lesser offense of premeditated first-degree murder. As such, Jones' request for an instruction on attempted voluntary manslaughter was legally appropriate. This type of voluntary manslaughter is a knowing killing of a human being committed "upon an unreasonable but honest belief that circumstances existed that justified use of deadly force." See K.S.A. 2015 Supp. 21-5404(a)(2). K.S.A. 2015 Supp. 22-3414(3) requires lesser included offense instructions "where there is some evidence which would reasonably justify a conviction of some lesser included crime."

Jones' argument for a jury instruction on the lesser offense of attempted voluntary manslaughter fails for much the same reasons as his argument for a jury instruction on self-defense. The evidence at trial showed that Jones was the initial aggressor in the incident that occurred outside Ashlock's house. But more importantly, Jones unequivocally testified that he never intended to hit anybody with the gunshots; he only fired the shots because he wanted Gordon, Lawrence, and Parker to leave. As previously

11

discussed, Jones' testimony that he was not trying to hit anyone with the shots is logically inconsistent with a claim that he subjectively believed deadly force was necessary. This lack of intent to injure anyone precludes a claim of self-defense and thereby precludes a claim of imperfect self-defense. Thus, the district court did not err when it denied Jones' request to instruct the jury on the lesser offense of attempted voluntary manslaughter.

Jones also claims that he was denied a fair trial based on the cumulative effect of the two instructional errors. The test for cumulative error is whether the totality of the circumstances establishes that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). However, the court will find no cumulative error when the record fails to support any of the errors the defendant raises on appeal. *State v. Santos-Vega*, 299 Kan. 11, 27-28, 321 P.3d 1 (2014). For the reasons we have discussed, the district court did not err when it denied Jones' requested jury instructions. Because the record does not support any error, Jones is not entitled to relief under his claim of cumulative error.

CONSTITUTIONAL CHALLENGES TO RESTITUTION

Next, Jones argues that the Kansas criminal restitution scheme violates § 5 of the Kansas Constitution Bill of Rights because it encroaches on a criminal defendant's right to a civil jury trial to determine restitution. The State asserts that Jones should be prohibited from raising this argument on appeal because he did not raise it before the district court and, in the alternative, the argument is without merit.

Determining a statute's constitutionality is a question of law subject to unlimited review. The appellate courts presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. Courts must interpret a statute in a way that makes it constitutional if there is any reasonable construction that would maintain the legislature's apparent intent. *State v. Soto*, 299 Kan. 102, 121, 322 P.3d 334 (2014).

12

Specifically, Jones argues that § 5 of the Kansas Constitution Bill of Rights preserves the right to a jury trial as it existed at common law when the Kansas Constitution was enacted. At common law, tort actions were triable to a jury and this included jury findings of causation and damages. Jones argues that the legislature abridged this right to a jury trial for tort actions by permitting victims of crimes to bypass a jury trial and receive a monetary judgment from a defendant through a court order of restitution under K.S.A. 2015 Supp. 21-6604(b)(1). According to Jones, the legislature may abridge the constitutional right to a jury trial only if it complies with the quid pro quo test. Jones argues that K.S.A. 2015 Supp. 21-6604(b)(1) violates the quid pro quo test because the legislature did not substitute any benefit to criminal defendants in return for stripping their right to have a jury determine their liability for and the amount of monetary damages to crime victims.

Constitutional grounds for reversal asserted for the first time on appeal are not properly before an appellate court for review. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). However, there are three exceptions to this rule:  (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

Jones acknowledges that he did not raise his argument before the district court. However, Jones argues that this court should still review the merits of his claim because it only involves a question of law arising on proved or admitted facts and is finally determinative of the case. He further argues that consideration of the claim is necessary to serve the ends of justice or to prevent a denial of his fundamental rights.

13

We disagree with Jones that either of these exceptions is applicable. The first exception does not apply because the determination of Jones' restitution claim is not finally determinative of the case. The second exception does not apply because it cannot be argued that consideration of the issue is necessary to serve the ends of justice or to prevent a denial of fundamental rights when Jones did not even object to the imposition of or the amount of restitution at sentencing. See *United States v. Dudley*, 739 F.2d 175, 179 (4th Cir. 1984) (appellate court refused to consider restitution issue for first time on appeal when defendant failed to object to restitution in district court). Therefore, we reject Jones' constitutional issue as not properly preserved for appellate review.

In a related issue, Jones argues that Kansas' criminal restitution scheme violates the ruling in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Again, Jones failed to raise this issue before the district court, and we find no applicable exception to address the issue for the first time on appeal. Although we decline to address the merits of Jones' claim, we note in passing that this court previously has held that the imposition of restitution in a criminal case does not implicate *Apprendi*. See *State v. Huff*, 50 Kan. App. 2d 1094, 1103-04, 336 P.3d 897 (2014), *rev. denied* 302 Kan. ___ (August 4, 2015).

Finally, Jones argues that the district court unconstitutionally used his two prior juvenile adjudications to elevate his criminal history at sentencing without requiring the State to prove the adjudications to a jury beyond a reasonable doubt, which Jones claims violates *Apprendi*, 530 U.S. 466. As Jones acknowledges, the Kansas Supreme Court previously has rejected this argument in *State v. Hitt*, 273 Kan. 224, 236, 42 P.3d 732 (2002). This court is duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position. *State v. Belone*, 51 Kan. App. 2d 179, 211, 343 P.3d 128, *rev. denied* 302 Kan. ___ (September 14, 2015). There is no indication that our Supreme Court is departing from its holding in *Hitt*.

14

Affirmed.