IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,712

STATE OF KANSAS,
*Appellee*,

v.

SONY UK,
*Appellant*.

SYLLABUS BY THE COURT

1.

The mere existence of a "sudden quarrel" immediately preceding a homicide, without evidence of legally sufficient provocation, is insufficient to make a jury instruction on voluntary manslaughter factually appropriate.

2.

When the evidence shows the existence of a "sudden quarrel" or "heat of passion," the trial court performs a limited gatekeeping function to determine whether the degree of such quarrel or passion, when viewed in a light most favorable to the defense, is objectively sufficient, such that an instruction for voluntary manslaughter is factually appropriate.

3.

The concepts of "sudden quarrel" and "heat of passion," as used in the statutory definition of voluntary manslaughter, are not separate concepts.

4.

PIK Crim. 4th 54.150(d) (2018 Supp.) accurately defines premeditation and adequately distinguishes premeditated intentional conduct from nonpremeditated intentional conduct.

Appeal from Lyon District Court; MERLIN G. WHEELER, judge. Opinion filed April 17, 2020. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Amy L. Aranda*, first assistant county attorney, argued the cause, and *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.: Sony Uk challenges his conviction for first-degree premeditated murder in the killing of Mahogany Brooks. Finding no error, we affirm.

FACTS

On the evening of March 9, 2017, a number of people saw Uk riding through the streets of Emporia on a bicycle while carrying a shotgun. Uk parked his bike at an apartment building and carried his shotgun inside. Residents of the apartment building knew Uk to be associated with Mahogany Brooks, who lived in the building.

Shortly before 9:51 p.m., the sound of shotgun fire echoed through the apartment building. Several witnesses described hearing between four and eight shots, noting a

pause between the first set of shots and the final two. During this pause, residents heard the sound of someone running, the sound of someone hitting a door and falling to the ground, and a woman's voice calling for help.

The most dramatic accounts of the shooting came from residents Tyler Smith and Chris Mosby, who at first heard "[s]ome hollering and what [they] thought was slamming or loud bangs going on" in the apartment hallway. According to Smith, "[He and Mosby] had a pretty good idea that it was [Uk] and [Brooks] arguing. [Brooks] would get drunk and they would argue." This incident, however, "seemed like it was a little more out of hand than usual." Smith heard two loud noises, slightly spaced apart, which he believed to be the product of a door being slammed. Then, after they heard someone screaming in the hallway, Mosby and Smith looked out into the hallway. Mosby thought he could hear a female voice calling for help but wasn't certain. At that point, they heard another "loud bang[,]" which Smith had now determined to be a gunshot.

Mosby stepped into the hallway to see "someone holding a shotgun and someone laying on the floor." Mosby recognized the man with the shotgun as Uk. Mosby quickly retreated inside his apartment and called 911. Mosby had heard three shots before he stepped out into the hall, then one more after he retreated back inside his apartment.

Through the gun smoke that filled the hallway, Smith—who looked out after Mosby stepped back inside the apartment—saw the silhouette of a shotgun-wielding man standing over the body of a woman on the floor of the hallway. Smith heard another gunshot and saw "the flash of the fire" coming out of the shotgun's barrel, which was pointed at the body on the floor. As the man turned toward him, Smith also retreated into his apartment and locked the door.

Police responded to the apartment building within minutes. Shortly after arriving, officers spotted Uk leaving Brooks' apartment. Uk retreated into the apartment when the

officers commanded him to halt. After 45 minutes to an hour, the police finally convinced Uk to come out of the apartment. Uk had blood on his shirt and his shoe, the latter of which was later determined to be Brooks'.

As they swept the building, officers spotted a deceased individual—Brooks—lying in the second floor hallway. Brooks had suffered wounds from multiple close-range shotgun blasts. A later autopsy revealed that Brooks was alive when she received all but one of them. All but one of Brooks' distinctly identifiable wounds likely would have been individually fatal.

The hallway presented a grim picture. The walls were stained with blood and "other human matter," and several spent shotgun shell casings littered the floor. The first bloodstain appeared 17 feet beyond the threshold of Brooks' apartment, and the bloodstains increased with size and frequency in the direction of Brooks' body. Brooks' body lay in the hallway, approximately 60 feet away from her apartment. Two spent shotgun shells were beside Brooks' body, along with two additional spent shells further down the hallway in the direction of Brooks' apartment. All four shell casings were found between the first blood spatter and the place where Brooks' body lay.

Inside Brooks' apartment, officers recovered a total of seven unspent shotgun shells that were the same size as the spent shells, along with a spent shell inside the doorway to the bedroom. Other than the presence of a spent shotgun shell, there were no obvious signs of a struggle. Officers also found a Mossberg Maverick shotgun hidden beneath a mattress. A spent shell was still inside the shotgun, but otherwise the gun was empty. The shotgun's serial number matched that of a weapon Uk had bought online several weeks before, which had been transferred to Uk on January 19, 2017. Uk had also purchased several shotgun shells of the same size and brand as those that were recovered

from the apartment building. Thus, altogether, investigators found a total of six spent shotgun shell casings: four in the hallway (including the two near Brooks' body), one in the doorway to Brooks' bedroom, and one in the shotgun itself.

The State charged Uk with first-degree premeditated murder. The case ultimately went to a jury trial. At the jury instruction conference near the end of the trial, Uk's counsel asked for a voluntary manslaughter instruction, asserting that a jury could conclude that Uk and Brooks had gotten into an altercation prior to Brooks' death.

The district court rejected Uk's requested voluntary manslaughter instruction over the objection of Uk's counsel, finding no evidence of legally sufficient provocation. But Uk's counsel did not object to Instruction No. 11, which contained the definition of "premeditation" and mirrored PIK Crim. 4th 54.150(d) (2018 Supp.). The district court then instructed the jury on first-degree premeditated murder and intentional second-degree murder as a lesser included offense.

The jury ultimately convicted Uk of premeditated first-degree murder. Uk timely appeals.

ANALYSIS

Uk raises two issues. He first claims the district court erred in refusing to give the jury a requested instruction on voluntary manslaughter as a lesser included offense of first-degree murder. He also argues the district court committed clear error in issuing an unmodified version of the PIK instruction on premeditation. Neither claim is persuasive.

5

*A voluntary manslaughter instruction was not factually appropriate.*

When presented with a claim that a district court has committed an error by refusing to issue a jury instruction:

> "(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *Ward*[, 292 Kan. at 565]." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

"The first element of this analysis ultimately affects the last one 'in that whether a party has preserved an issue for review will have an impact on the standard by which we determine whether an error is reversible.'" *State v. Ross*, 310 Kan. 216, 223, 445 P.3d 726 (2019) (quoting *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 [2015]). Because Uk's trial counsel objected to the district court's refusal to give a voluntary manslaughter instruction, the harmlessness standard set forth in *Ward*—rather than clear error—applies. See *Barber*, 302 Kan. at 377. And because a district court's refusal to give a requested lesser included offense instruction does not violate a defendant's constitutional right, "the error is reversible only if we determine that there is a 'reasonable probability that the error will or did affect the outcome of the trial in light of the entire record.'" *Plummer*, 295 Kan. at 168 (quoting *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 [2011]).

All parties agree that voluntary manslaughter under K.S.A. 2019 Supp. 21-5404 is a lesser included offense of premeditated first-degree murder, as set forth in K.S.A. 2019 Supp. 21-5402(a)(1). Thus, the requested instruction was legally appropriate. See, e.g., *State v. Brownlee*, 302 Kan. 491, 512, 354 P.3d 525 (2015).

The question, then, is whether the instruction would have been factually appropriate. Generally, "'lesser included offense instructions must be given when there is some evidence, [viewed in a light most favorable to the defendant,] emanating from whatever source and proffered by whichever party, that would reasonably justify a conviction of some lesser included crime.'" *State v. Gentry*, 310 Kan. 715, 722, 449 P.3d 429 (2019) (quoting *State v. Haygood*, 308 Kan. 1387, 1408, 430 P.3d 11 [2018]). However, when evaluating the factual appropriateness of a voluntary manslaughter instruction, courts consider whether there was "'an adequate provocation that deprives a reasonable person of self-control and causes that person to act out of passion rather than reason.'" *Gentry*, 310 Kan. at 722 (quoting *State v. Bernhardt*, 304 Kan. 460, 475-76, 372 P.3d 1161 [2016]). Under this framework, "'Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter.'" 310 Kan. at 722 (quoting *Bernhardt*, 304 Kan. at 475-76). Additionally, "Whether provocation was legally sufficient is based on an objective standard." 310 Kan. at 723.

Uk raises two alternative theories to support his claim of error in the court's refusal to give a voluntary manslaughter instruction. First, he argues that it was improper for the district court to evaluate the *degree* of the quarrel, as opposed to its *existence*. Uk emphasizes the testimony of witnesses who heard the sounds of an argument immediately before the shooting began, asserting that it was the jury's responsibility to determine whether the argument was of sufficient intensity to warrant a voluntary manslaughter conviction.

7

Uk's argument is not persuasive. Our analysis of the legal sufficiency of provocation is nested within the overall question of factual appropriateness. See *State v. Hilt*, 299 Kan. 176, 195, 322 P.3d 367 (2014) ("But, even when this evidence is viewed in a light most favorable to Hilt, it simply does not support the development or existence of a sudden quarrel . . . much less one that could have caused an ordinary man to lose control of his actions and his reason."). In other words, while the district court employs a gatekeeper function, it is limited to determining whether a purported incident—the existence of which is evaluated in a light most favorable to the defendant—rises to the objective *legal* threshold of sufficient provocation.

Here, evidence of a quarrel was limited to the testimony that Uk and Brooks sounded as though they were arguing immediately before the shooting. The testimony implied that it was not unusual for Brooks and Uk to argue, and this court has considered the recurring nature of an argument as tending to "negate the 'sudden' aspect of sudden quarrel; the argument did not happen 'without warning' and was foreseeable." *Bernhardt*, 304 Kan. at 477.

Based on the absence of any evidence as to the adequacy of provocation preceding the shooting, the district court did not err in exercising its gatekeeping role. In order to conclude that legally sufficient provocation existed, we would have to infer that the unknown nature of the alleged argument was objectively sufficient to cause Uk to lose all reason and shoot Brooks multiple times—including at least once, and perhaps twice, when she was helpless on the ground—while following her for more than 60 feet down a hallway, during which time she was crying out for help. Even viewing the evidence in a light most favorable to Uk, this inference is not viable. See *State v. Northcutt*, 290 Kan. 224, 234, 224 P.3d 564 (2010) ("Because there is no evidence of provocation by [the defendant], much less severe provocation, the trial court was not required to instruct the jury on voluntary manslaughter."); see also *Bernhardt*, 304 Kan. at 477 (a slap did not

constitute legally sufficient provocation for defendant's "later, coldly callous behavior"); *State v. Gallegos*, 286 Kan. 869, 874-75, 190 P.3d 226 (2008) (victim shot five times after telling defendant to calm down). Thus the district court did not err in finding a requested instruction on voluntary manslaughter to be factually inappropriate.

Second, Uk argues that Kansas caselaw has erroneously conflated the separate statutory elements of "sudden quarrel" with "heat of passion," claiming that the adequacy of provocation is irrelevant when a "sudden quarrel" is at issue. Uk's argument essentially asks the court to overturn more than four decades of precedent on this point. See *State v. Coop*, 223 Kan. 302, 305-07, 573 P.2d 1017 (1978). In *Coop*, after examining the law of several other jurisdictions, the court wrote:

> "Sudden quarrel is one form of provocation for 'heat of passion' and is not separate and apart from 'heat of passion.' The provocation whether it be 'sudden quarrel' or some other form of provocation must be sufficient to cause an ordinary man to lose control of his actions and his reason." *Coop*, 223 Kan. at 307.

Although we are not inextricably bound by our own precedent, "[w]e do not overrule precedent lightly and must give full consideration to the doctrine of stare decisis." *State v. Sherman*, 305 Kan. 88, 107, 378 P.3d 1060 (2016). Yet as Uk notes, one previous opinion observed that the language of the voluntary manslaughter statute "suggests that 'a sudden quarrel' and 'in the heat of passion' are two separate concepts," although that opinion ultimately went on to reiterate the reasoning set forth in *Coop*. *State v. Wade*, 295 Kan. 916, 924, 287 P.3d 237 (2012). Subsequent cases have also relied on *Coop*'s reasoning for this point. See, e.g., *State v. Story*, 300 Kan. 702, 711, 334 P.3d 297 (2014).

Notwithstanding the *Wade* court's observation, we decline to overrule *Coop*. If accepted, Uk's position would essentially require a voluntary manslaughter instruction

9

whenever an argument precedes a killing, regardless of the origin, nature, or degree of the argument. Without the limiting principle of legally sufficient provocation, the crime of voluntary manslaughter could be factually indistinguishable from the crime of second-degree murder in cases involving a homicide during an argument. See, e.g., *State v. Stafford*, 213 Kan. 152, 166, 515 P.2d 769 (1973) ("[A]n intentional homicide committed upon a sudden quarrel or in the heat of passion engendered by adequate provocation, and not the result of malice conceived before the provocation, is voluntary manslaughter. Suffice it to say further, although there was some evidence of prior quarreling and even of a blow being struck by the decedent, we believe insufficient provocation existed to reduce to voluntary manslaughter the eventual strangulation of one flat on his back in a disabled condition. [Citation omitted.]"), *reh'g denied and opinion modified*, 213 Kan. 585, 518 P.2d 136 (1974).

Accordingly, as the evidence in this case did not establish legally sufficient provocation, we find no error in the district court's decision not to instruct the jury on voluntary manslaughter. Because we find no error, we need not address the harmlessness of the district court's decision.

*The district court did not err in defining premeditation for the jury.*

Uk next claims the district court's jury Instruction No. 11 did not sufficiently define the concept of "premeditation."

Our standard of review follows the same framework as in the preceding issue. However, since Uk did not object to Instruction No. 11, our assessment of harmlessness—should we reach it—instead involves

"the clear error standard mandated by K.S.A. 2017 Supp. 22-3414(3). Under that standard, an appellate court assesses whether it is 'firmly convinced that the jury would

10

have reached a different verdict had the instruction error not occurred.' Williams has the burden to establish reversibility, and in examining whether he has met that burden we make a de novo determination based on the entire record. [Citations omitted.]" *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 (2018).

Uk's argument implicates the legal appropriateness of Instruction No. 11, which mirrored the text set forth in PIK Crim. 4th 54.150(d); he raises no challenge to the instruction's factual appropriateness. Instruction No. 11 stated:

"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

Uk claims Instruction No. 11 left the jury unable to distinguish between premeditated (first-degree) murder and intentional (second-degree) murder. To support his claim, Uk relies largely on an early Kansas case's definition of premeditation that involved the phrase, "plan, contrive or scheme beforehand." *Craft v. The State of Kansas*, 3 Kan. 450, 483 (1866). He argues that, without this language, Instruction No. 11 could not be distinguished from the statutory definition of intent, i.e., "when it is such person's conscious objective or desire to engage in the conduct or cause the result." K.S.A. 2019 Supp. 21-5202(h).

The court has previously expressed strong general support for the use of PIK instructions by district courts. See, e.g., *State v. Dixon*, 289 Kan. 46, 67, 209 P.3d 675 (2009). The ultimate goal of any jury instruction is effective communication. That goal is achieved through words given and understood in context. Though the words "intent" and "intentional" are both used within the two sentences comprising Instruction No. 11, the meaning of those two words is communicated within the context of the other words that are also used. Those other words leave no doubt that "premeditation"—as a thought

11

process conducted some time before an act—is clearly different than the intentional nature of the act itself. Thus, the instruction fairly and clearly sets forth the law, and no reasonable jury would have trouble distinguishing the conduct described by Instruction No. 11 from the statutory definition of intentional conduct set forth in K.S.A. 2019 Supp. 21-5202(h).

We thus find Instruction No. 11 to be legally appropriate. Lacking a challenge to its factual appropriateness, we find no error—let alone clear error—in the district court's decision to issue an essentially unmodified PIK instruction on the definition of premeditation. Accordingly, we need not address harmlessness.

CONCLUSION

Uk's conviction for first-degree premeditated murder is affirmed.

PATRICK D. MCANANY, Senior Judge, assigned. [1]

---

[1]**REPORTER'S NOTE:** Senior Judge McAnany was appointed to hear case No. 119,712 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.